**UNITED STATES of America,**
**Appellee,**

v.

**Luis Gomez ORTEGA et al., Defendants-**
**Appellants.**

**Nos. 221, 222, Docket 72–1479, 72–1482.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 13, 1972.

Decided Dec. 11, 1972.

Certiorari Denied April 23, 1973.
See 93 S.Ct. 1924.

Arthur J. Viviani, Asst. U. S. Atty., New York City (Kenneth Feinberg, John M. Walker, Jr., John W. Nields, Jr., Asst. U. S. Attys., and Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, New York City, on the brief), for appellee.

Herald Price Fahringer, Buffalo (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, on the brief), for defendant-appellant Luis Gomez Ortega.

Nancy Rosner, New York City (Edmund Allen Rosner and Rosner & Rosner, New York City, on the brief), for defendant-appellant George Warren Perez.

Ivan S. Fisher, New York City (Albert J. Krieger and Alan Scribner, New York City, on the brief), for defendant-appellant Jean Orsini.

Before FRIENDLY, Chief Judge, and MEDINA and ANDERSON, Circuit Judges.

MEDINA, Circuit Judge:

This is an appeal from judgments, entered upon the verdict of a jury, after a trial before Judge Pierce, by Ortega, Perez and Orsini, each of whom was found guilty on both counts of an indictment charging them with conspiracy to

import, distribute and possess with intent to distribute 93½ kilograms of heroin, in violation of 21 U.S.Code, Section 846, and with distribution and possession with intent to distribute a smaller quantity, about a half kilogram, of heroin, in violation of 21 U.S.Code, Section 841(b)(1)(A), and aiding and abetting, in violation of 18 U.S.Code, Section 2. Ortega and Orsini were each given heavy sentences of 10 and 15 years imprisonment on the two counts, to be served consecutively, and fines of $10,000 and $25,000, or an aggregate of $35,000 were imposed on each. Perez was sentenced to 7 years imprisonment on each count, to be served concurrently, and he was fined a total of $7,000. These three appellants are now serving their sentences.

Each appellant claims that the evidence adduced by the prosecution was far short of what was required to establish the commission of the crimes charged. Each of them also asserts that the judgment of his conviction must be reversed for a variety of other reasons which we can more readily describe after stating in chronological order the facts as the jury may have found them to be.

I

*The Background and the Development of the Conspiracy*

Somewhere in the world there must be persons of enormous wealth and influence who individually or in groups support and manage the gathering of the raw materials, the processing of vast quantities of heroin and the sending of this heroin to the United States. These unknown persons operate in many countries and one of the characteristics of their operations that helps these master minds to avoid detection is that their numerous agents often have no acquaintance with one another until they converge and carry out their secret orders with respect to the distribution of a particular shipment and the receipt and return of the money to those who had

planned and supervised the venture. This record does not disclose the over-all operations of this international narcotics ring, nor the identity of those who plan its operations. Nor does the indictment contain any such charge. But the record does disclose and the indictment charges these particular appellants with the crimes above stated with reference to a particular shipment of a very large quantity of uncut and practically pure heroin, amounting to 93½ kilograms and of a retail value of $1,000,000, according to the evidence. This heroin was hidden in a variety of open spaces in the construction of the chassis of a tan colored Jaguar Sport Car, and these 180 bags of heroin could have been concealed in this automobile only after it had been dismantled by skilled mechanics and then put together again. Of the individuals who converged and met in New York City to carry out their secret orders and to transport and deliver this heroin and receive the money to be paid by the prospective purchasers, one was a Corsican who came from Barcelona, Spain, one came from France and two were Cubans at least temporarily living in New York City or the vicinity. French and Spanish interpreters were in attendance throughout the trial. We do not know who supplied this large quantity of heroin or who paid for it or who secreted the bags in the Jaguar. Nor do we need to know. We do know that upon arrival in New York the Jaguar contained the hidden 180 bags of heroin and we do know that each of these appellants played his several role, working with the others and that they were in possession and control of the Jaguar at the time they were all taken into custody. As we shall see, the evidence of the acts of these three conspirators and their knowledge that heroin was concealed in the Jaguar is overwhelming.

We give this brief description of the background because the man who bought the Jaguar in England and who came with it to New York on the Queen Elizabeth II, and the man who turned it over to those who were waiting here to re-

ceive it was a government informer. The principal point raised by appellants is that they claim the trial judge should have forced the government not only to identify this informer but to describe his whereabouts and to produce him for the alleged purpose of giving appellants an opportunity to put him on the witness stand and support what appellants choose to call their "defense" of entrapment. It was stipulated that the informer purchased the Jaguar in England in the presence of one of the U.S. Narcotics Agents, that is to say that the agent saw him buy it, and that the government did not furnish any money to buy the Jaguar or give any instructions to the informer to buy it. The informer had no contact whatever with any of these appellants and the so-called "defense" of entrapment was not supported by any proof whatever, as none of the appellants testified at the trial. Moreover, with such a large shipment and the total absence of any showing that the government paid for any part of the heroin or had anything whatever to do with hiding the 180 bags of heroin in the Jaguar, we think this wholly unsubstantiated "defense" is absurd. We shall return to this subject later.

The events charged in the indictment commence in August of 1971 when a Frenchman named Etienne Gunther, who lived with his wife and young daughter in Paris, went to Niolon, a small village near Marseilles, and spent the weekend at the villa of Etienne Mosca, who had formerly been the husband of Gunther's sister Georgette. Gunther knew that Mosca was a trafficker in heroin and the upshot of the visit was that Gunther agreed on September 7, 1971 to go to the United States and bring back a large quantity of currency which he was to smuggle into France and deliver to Mosca. The arrangements made between Mosca and Gunther, who pleaded guilty to one of the counts of the indictment and later testified for the government at the trial, give a clear blueprint of what was to take place. And the cunning way in which Ortega, Perez and Orsini covered their tracks and resorted to subterfuges, the use of false names and a continual shuttling around to avoid detection, form a web of direct and circumstantial proof from which these appellants could find no avenue of escape.

The basic plan was simple. One person, who, unknown to the participants in the conspiracy, turned out to be the government informer, was to bring the Jaguar and its hidden 93½ kilograms of heroin from England to the United States on the Queen Elizabeth II, leaving Southampton September 10, 1971. The schedule was tight. Gunther and his wife were to arrive by plane in New York on September 14; the Queen Elizabeth II docked in New York on September 15. Although the persons involved in the operation did not previously know one another, clandestine means were planned by which the car and its contents could be delivered to one of the conspirators, and by which the conspirator who thus had control of the Jaguar and its contents could make contact with the others who were to distribute this large quantity of heroin and receive the money to be paid for it. The final stage was to be the return of Gunther to France with the money, not later than Monday, September 20th. The conspirators thought they were operating successfully on schedule until Ortega, Perez and Orsini were arrested in the early morning of Sunday, September 19th, as they were attempting to drive off the Jaguar to make the delivery and receive the money. They had made the necessary contacts with one another, they had provided the place where the heroin was to be weighed, packed and delivered, and Gunther had started to build the false bottoms in the suitcases provided by Mosca to hide the large quantity of currency to be smuggled back into France by Gunther.

We may remark, parenthetically, that a combination of customs agents and agents of the Bureau of Narcotics and Dangerous Drugs made an examination of the Jaguar and its contents in the

hold of the Elizabeth II as she came up the harbor and one of the 180 bags of heroin was removed for testing. Late the next night while the Jaguar was in a garage opposite the Playboy Club, where the informer was disporting himself with a young lady, government mechanics dismantled the Jaguar, removed 178 bags of the heroin and substituted a similar number of bags containing a harmless lactose, and left hidden in the car bag number 179, with its original contents of pure, uncut heroin. A final search of the Jaguar was made after the arrest and this disclosed bag number 179 and its contents just where the government agents had left it. In the meantime, however, Ortega, Perez and Orsini thought the Jaguar, now in their possession and under their control, contained its original load of 180 bags or 93½ kilograms of heroin. Appellants claim that all these searches, or most of them, were made without warrants and without probable cause in violation of their Fourth Amendment rights. Even the searches made in execution of warrants are attacked as made without probable cause and on the basis of insufficient affidavits.

We shall now trace the covert operations of the conspirators. On Friday, September 17, the Jaguar was parked in the New Madison Square Garden public garage by the man who had brought it from England. Gunther had never seen this man but Mosca had shown Gunther a photograph of him. They were to meet at #8 Bowling Alley in the New Madison Square Garden at 12:00 to 12:30 P.M. or 6:00 to 6:30 P.M. and they were to recognize one another by the identification of a folded newspaper and a pen-shaped key ring that each was to carry. They met at the appointed time and place, recognized one another and the parking ticket was delivered to Gunther. At this point the informer steps out of the picture and he has nothing to do with Gunther's making contact with the second unknown, who turned out to be Orsini, who had arrived by

plane from Barcelona, Spain one day behind schedule.

The meeting between Gunther and Orsini takes place. This time the recognition signal is that each is to carry an unfolded newspaper and a flashlight-shaped key ring and Gunther was to use the code name Thomas. The parking ticket for the Jaguar is now turned over to Orsini and elaborate arrangements are made for a later meeting at which Orsini was to hand over the money to Gunther to be taken back to France.

In Orsini's possession at the time he received the parking ticket from Gunther were several documents written in French. These were on Orsini's person at the time Ortega, Perez and Orsini were arrested. One of these documents contains a description of how Orsini is to recognize Gunther and the code name "Thomas," another is a diagram of the Jaguar showing the 10 places where the 180 bags of heroin were concealed and still another document containing instructions how to take the Jaguar apart to get out the heroin.

The government agents knew that the Jaguar and its contents had arrived and they had taken the precaution of seizing all but one bag of this very valuable cargo. But they did not know to whom the Jaguar and its supposed contents were to be delivered nor who the other cooperating members of the conspiracy might turn out to be. How these people were located is the story of a very fine piece of detective work. And, as this story unfolds, it becomes clearer at every step that each of these appellants knew they were possessing and distributing an unusually large shipment of heroin and that their guilt of the charges contained in the indictment was established.

So, on Saturday, September 18, the agents followed Orsini from the Hotel Abbey Victoria, where he met Gunther, to the Hotel Alrae where Orsini had registered as a guest, using the false name

of Jean Pierre Andre Huguen.[1] Now that he had in his pocket the parking ticket and instructions how to dismantle the Jaguar and get out the heroin, we might expect him to make a beeline for the people who were to help distribute the heroin and collect the money, and that is precisely what Orsini did, with the usual backing and filling and getting in and out of cabs that indicate an effort to throw any government agents off the scent. So, Orsini started off in a cab and went straight to 587 Riverside Drive, where Ortega was to be found. When a search warrant was executed and the contents of Orsini's room at the Hotel Alrae were seized, there was found a memorandum containing the following:

476 Riverside Drive Apt. 1D
New York—N.Y. 10031
1 5 ①—3738

The 1 in a circle is a code indication that the real Riverside Drive address is to be obtained by adding 1 to each of the numbers in 476. Thus Orsini knew that the man he was looking for was at 587. Certain numbers also appear on this memorandum which is on Hotel Alrae notepaper. The inference, of course, is that Orsini brought with him from Barcelona the papers in French giving him instructions how and where to identify Gunther, describing the hiding places of the 180 bags of heroin and how to take the car apart to get them, but the memorandum giving Ortega's address in code was made after some telephoning by Orsini in the interval between his arrival at the Alrae after receiving the parking ticket from Gunther and 3 P.M. when he started to go up to 587 Riverside Drive. He stayed there only a few minutes and then went back to the Alrae. There was no time to lose if he was to effect delivery of the heroin and have the money representing the purchase price ready to hand to Gunther on Monday, September 20, at the Sports Bar on 51st Street between 8th and 9th Avenues, as agreed between Gunther and Orsini at the time of delivery of the parking ticket. What Orsini was to hand to Gunther at the Sports Bar was the money.

This was a busy time for the conspirators. They must prepare a place to unload the Jaguar, a place to weigh and repack this huge quantity of heroin and get together the pile of bills that Gunther was to hide in the false bottoms of the suitcases given to him by Mosca. Gunther was busy constructing these false bottoms according to detailed instructions from Mosca, but time ran out and he and these three appellants were arrested when their plans miscarried and the Jaguar broke down just as they were on their way to make delivery of the heroin and get the money ready. More of this later.

Orsini left the Alrae again at 4 P.M. on Saturday, September 18. He handed the cab driver, who happened to be a government agent, a slip of paper on which was written the address 1021 Kennedy Boulevard, West New York, New Jersey. In a conversation in part French and part broken English Orsini displayed some knowledge of the part of New Jersey where they went. There was again the usual going in and out of buildings, walking up and down the street and passing some time in a bar. Finally, Orsini returned to the Alrae. He left the Alrae at 10 P.M. with Ortega and they both walked to the corner of 63rd Street and Madison Avenue, where they got in a maroon 1970 Ford station wagon driven by Perez, and all three drove off together.

Between 10:00 P.M. and 12:20 A.M. on Sunday, September 19, Orsini, Ortega and Perez managed to escape the surveillance of the agents. But bits of evidence when put together make it pretty clear that the three were busy in New Jersey getting ready for delivery of the heroin. The agents had the license number and a description of the Ford station wagon. This was found abandoned in Hackensack, N. J. It was reg-

---

1. The prosecution found out through the French police that his real name was Jean Orsini.

istered in the name of Rafael Rivera who gave his address as 608–82nd Street, North Bergen, N. J., which was not far from West New York and not a great distance from Hackensack. And it turned out that, when searched after his arrest, Perez had in his pocket the keys of the maroon Ford station wagon and a driver's license, a Social Security card, and a Selective Service Draft Certificate, all in the false name of Rafael Rivera. Perez gave the North Bergen residence as his address. It also turned out, as disclosed by the execution of a search warrant on this same September 19, also after the arrest, that 608–82nd Street, North Bergen, N. J. contained a vacant apartment, on the ground floor of a two-family house, with the name Rivera on or near the entrance door, and that hidden under the sink in a closed compartment, covered by newspapers, was a flexible balsam board and a Hanson 25 pound scale appropriate for the weighing and measuring of large quantities of. heroin. It also appeared that Ortega at the time of his arrest was carrying a driver's license in the name of Santos Hernandez who was supposed to live at the same address, 608–82nd Street, North Bergen, N. J. So two of these three appellants were tied in together at this vacant dwelling, which seemed to be a perfect choice for the conduct of such an illegal enterprise as the weighing and packaging of 93½ kilograms of heroin for delivery. And the third of these appellants, Orsini, had been seen cruising around the vicinity. It is significant that on September 16, 1971 the New Jersey Division of Motor Vehicles issued the registration of a Chevrolet to the supposed Santos Hernandez, or Ortega. This is the very day the Jaguar was parked at the New Madison Square Garden Garage. And it is in this same Chevrolet that we find Perez and Orsini escorting Ortega, who was driving the Jaguar, at the time of the arrest, as will appear shortly.

In any event, having made the necessary arrangements for delivery and payment, to their satisfaction, the trio now present themselves at the New Madison Square Garden Garage to pick up the Jaguar and its contents. It is now after midnight. The abandonment of the Ford station wagon in Hackensack is explained by the fact that Perez was now driving the Chevrolet. The trio had switched cars to put any possible followers off the scent. Ortega marched in with the parking ticket; the Jaguar is turned over to him by the garage attendant; but, to the dismay of the conspirators, the Jaguar will not start. The car is coasted down the ramp to the street floor; Perez comes in to help. Finally, the engine is started, with Ortega in the driver's seat. After going a block or two, immediately followed by the Chevrolet, driven by Perez with Orsini beside him, the Jaguar, which the conspirators believe is filled with a million dollars worth of pure, uncut heroin, comes to a final stop at the intersection of 8th Avenue and 31st Street. What happens then is interesting. Each of the trio, Ortega, Perez and Orsini, makes a desperate effort to start the car. They are literally surrounded by government agents who appeared to be bystanders. When one of these, diagnosing the situation as carburetor trouble, takes off the air filter, Perez pushes him away, fearing that perhaps some of the precious heroin might be disclosed if people began taking the car apart. Perez finally got a cab driver to come and help while Orsini and Ortega in the Jaguar were trying to get the engine going. At this point the three appellants were arrested, and a search of their persons, incidental to the arrest, and a search of the premises at 608–82nd Street, North Bergen, N. J., and of Orsini's room at the Alrae pursuant to search warrants produced the incriminating documents above referred to and other items that we pass over as we think what has already been written shows that there was ample evidence to sustain the findings of guilt on both counts as against each appellant. There is much additional incriminating evidence. At least Ortega and Orsini were old hands at the busi-

ness. False statements of one kind and another were made. But the essential facts are as above stated.

The testimonial and documentary proofs taken as a whole plainly justified, if they did not, indeed, compel a finding that Perez as well as Orsini and Ortega knew they were trafficking in heroin. The conspiracy and the knowing participation of each of these appellants were established beyond any doubt. There was ample proof that the three conspirators, Perez as well as Ortega and Orsini, were in joint possession and control of the Jaguar, which they thought contained the entire shipment of 180 bags of heroin, but which in fact only contained the ½ kilogram bag of heroin left in the car by the agents at the time they dismantled the Jaguar in the middle of the night at the garage opposite the Playboy Club. Moreover, the proofs were more than ample to establish aiding and abetting by Perez as charged in Count 2. So, we shall not discuss further the claim by each appellant that the evidence was insufficient to support the verdict and the judgments of conviction entered upon this verdict; and we turn to the other rulings that are alleged to call for a reversal of the judgments.

## II

*There Was no Error in the Series of Rulings Concerning the Identification, the Disclosure of the Whereabouts or the Production of the Government Informer*

From the beginning of the trial counsel for the defendants tried their best to manufacture some basis for reversal by their demands for the identification, disclosure of the whereabouts of and the production of the government informer who bought the Jaguar, brought it with its contents to New York, turned the Jaguar over to Gunther and then, without having seen or had any contact whatever with any of these appellants, disappeared from the scene of operations.

In their effort to show that the informer's testimony would be "relevant and helpful to the defense" or "essential to a fair determination" of the issues in the case, and thus bring the facts of this particular informer situation within the ruling of the Supreme Court in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the arguments of counsel for these appellants were presented in a double aspect. In the first place, they claimed that the informer, if his identity and whereabouts were disclosed, might be called by them to testify in support of a conventional entrapment defense, or, if interviewed, that he might lead counsel to the discovery of leads that might be helpful in the establishment of such a defense by other proof. But this is not a case where a government undercover agent plays an active part in the carrying out of the transaction that is charged in the indictment against the defendant, as was the case in *Roviaro*. This is no buying or selling of a few $5 glassine bags of diluted heroin in which heroin peddlers and addicts play their parts. This is not a case in which the informer is the only person who could testify to a version of the single, simple narcotics transaction in such manner as to establish the innocence of the defendant. This is a large undertaking by a ring of international heroin exporters and it involves a million dollar shipment of pure, undiluted heroin. The notion that the government planned and created this venture to entrap the unknown individuals who might ultimately appear in the United States and receive the 93½ kilograms of heroin, weigh and package it for delivery and remit the proceeds to those in charge of the complex international venture is on the very face of the matter quite beyond the stretch of any probability. Moreover, it is clear beyond peradventure of doubt, as demonstrated by what each of these appellants did to effectuate the purposes of the conspiracy, as outlined in our statement of the evidence, that each of these appellants was ready, willing and able

and had a prior propensity to engage in a heroin importation and distribution venture. So, we shall say no more of that phase of the entrapment claim.

The more serious phase of the so-called entrapment "defense" was the endeavor to bring this case within the ambit of those decisions that hold that where the government provides not only the occasion for committing the offense but also the contraband necessary for its consummation there is entrapment as a matter of law, irrespective of the propensity of the accused to commit the crime, because this is the only way to prevent such reprehensible and unworthy conduct on the part of the police. Thus in United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal.1970), the government informer received the counterfeit bills from the government, gave them to Chisum and then had him arrested for receiving counterfeit money with intent to pass the bills as genuine. In People v. Strong, 21 Ill.2d 320, 172 N.E.2d 765 (1961), the government supplied the very narcotics that gave rise to the alleged offense.

Without the slightest scintilla of proof, and without any offer of proof, and despite the fanciful nature of the hypothesis in the context of the facts disclosed in this record, counsel for the defendants made repeated statements that the million dollars worth of pure, uncut heroin had been purchased by the government, that the government had caused it to be placed in the Jaguar that had in turn been purchased with government funds, all for purposes of entrapment. It was at first in vain that the prosecutor insisted there could be no such issue in the case without some proof to back up these statements of counsel; that the record was bare of proof that the informant ever saw any heroin, that he ever put any heroin in the Jaguar, or any proof that this extensive international scheme of bringing heroin into the United States originated with either the informer or the government. Finally, as already indicated in our summary of the evidence, a stipulation was entered into between the prosecutor and counsel for all defendants that the government did not furnish any money to buy the Jaguar or give any instructions to the informer to buy it. One might have supposed that this would dispose of the matter. But no, counsel kept repeating their claims that the government had manufactured the crime and that they could prove it if only they could put their hands on the informer and get him into court as a witness. This led to almost interminable argument and discussion. Exercising meticulous care in seeing to it that appellants' rights should not be infringed, the judge listened and listened, and read and analyzed numerous cases cited to him. With this and the numerous suppression hearings during the trial, the members of the jury were sitting in the jury room twiddling their thumbs far more time than they spent in the courtroom listening to the evidence. While such interruptions of a trial are regrettable, the judge's patience had the salutary result of avoidance of error.

The informer issue was brought to a head by an intimation or suggestion by Mr. Fisher, counsel for Orsini, that perhaps progress could be made if; in the words of the trial judge "the government may choose to share with me *in camera* information which has bearing" on the role of the informer and the questions that had been raised by counsel for appellants. This met with general approval by counsel for all defendants, except that Mr. Fisher maintained that in the *in camera* proceeding, in the absence of counsel for appellants, the trial judge should be afforded an opportunity to question the informant. This led to a statement by the prosecutor that he could not produce the informant and that the Second Circuit decisions [2] made

---

2. The rule in this Circuit was articulated in United States v. D'Angiolillo, 340 F.2d 453, 455 (2d Cir.), cert. denied 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972

it perfectly plain that the government was not under any circumstances required to produce the informant. After everyone seemed to agree on this, the prosecutor said he objected to the *in camera* proceeding but would go ahead with it if the court so ruled, and the prosecutor requested a ruling, which was granted, to the effect that what occurred in the *in camera* proceeding should not be revealed to defense counsel. So, it was ordered that the transcript of the *in camera* proceeding by the court reporter be sealed and only unsealed upon proper showing to the court.

After all these preliminaries, and over the government's objection, the *in camera* proceeding took place, after it had been brought about at appellants' request. The prosecutor with his files of documents went into the trial judge's chambers with the court reporter. After this was over, Judge Pierce returned to the courtroom and said:

> The Court: Gentlemen, Mr. Walker has made available to me, in camera, material which causes me to be familiar with the role of the informant in this case.
>
> On the basis of that familiarization, I can find no ground for supporting your requests for either revealing his identity or asking the government's cooperation in producing him here.
>
> I have had in mind, as I reviewed this material, the specific matters which you have called to my attention, your specific concerns, your specific assertions, and I nevertheless find none of these to be supported in any way by the material I have reviewed.
>
> In fact, I find that the situation is quite to the contrary.
>
> On the basis of this in camera proceeding, with the cooperation of the government having made this possible, I rule on your motions at this time and deny them with respect to the informant.

We cannot consider as an objection Mr. Fisher's remark, subsequent to this ruling, that informers are generally unreliable and that one cannot pay much attention to what they say. There were no motions and no further rulings.

The position taken by the prosecutor from the beginning was correct. The record is completely bare of anything to show that the informer could give testimony relevant to or essential to a fair determination of any of the issues in the case. Thus the teaching of *Roviaro* has no application and all of the motions of defense counsel concerning the identification, the disclosure of the whereabouts or the production of the informer should have been denied without any *in camera* proceeding.

The references at the trial and in the briefs to United States v. Jones, 360 F. 2d 92 (2d Cir. 1966) and United States v. D'Angiolillo, 340 F.2d 453 (2d Cir.), cert. denied 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965), show nothing contrary to what we have above stated. What is meant by "may" or "might" is the same thing as saying that if it does appear in the record that the testimony of the informer is shown by reasonable probability to be relevant or essential to a fair determination of any of the issues in the case, the government's privilege against disclosure is not available.

This we think disposes of the question of identifying, disclosing the whereabouts of and producing the informer.

### III

### *The Trial Judge Properly Refused to Suppress Any of the Objects Found*

---

(1965), where this Court wrote: "where the informer's testimony may be relevant to the defense, the defendant is entitled to his name, to such information as the government may have concerning his whereabouts, and to reasonable cooperation in securing his appearance." The government is not required to actually produce the informer. See also, United States v. Roberts, 388 F.2d 646, 649 (2d Cir. 1968); United States v. Russ, 362 F.2d 843 (2d Cir. 1966); United States v. Jones, 360 F.2d 92 (2d Cir. 1966); United States v. Coke, 339 F.2d 183 (2d Cir. 1964).

*on the Persons of Ortega, Orsini and Perez at the Time of the Arrest or at the Vacant Premises Stated by Perez to be his Home or in Orsini's Room at the Hotel Alrae or the Heroin left in the Jaguar*

When one is once familiar with the interrelation of the separate bits of evidence in this complicated case, as sketched in our summary, it is difficult to imagine how there could have been any lack of probable cause for the arrests or any insufficiency in the affidavits upon the basis of which the search warrants were issued or of the proofs of probable cause adduced at the trial.[3] But the pattern of scraps and phrases culled from the mass of dicta and wide ranging observations found in the hundreds of court opinions in search and seizure cases gives an appearance of substance to what are mostly frivolous claims. They merit no more than brief discussion.

**A**

*The Jaguar and Its Contents*

■ The search by a Customs Agent and others helping him, in the hold of the Elizabeth II while still in midstream, was clearly proper as a border search. So was the cursory examination on the pier and the removal of a one-half kilogram bag of heroin from the car after the vessel was made fast. Under the circumstances of this case the search without a warrant in the midnight dismantling and reassembling of the Jaguar in the garage opposite the Playboy Club was a mere continuation of the border search. At this time the shipment of heroin was removed and placed in government custody, except for one-half kilogram bag that was left concealed under the driver's seat in such fashion that it could be disclosed and secured only by the use of tools. Surely the government was entitled to make it impossible for this large importation of dangerous drugs to slip through the fingers of its agents by some mischance. And it was equally proper to leave some of the heroin in the car for purposes of proof of the violations of the narcotics laws by those who might be expected to drive off the Jaguar in consummation of their illegal purposes, believing that still hidden in the inner recesses of the framework of the car was the entire 93½ kilograms of heroin.

■ Appellants make much of the fact that, for some period after the one bag of heroin was left concealed in the car, there was ample time to get a search warrant. They stress the fact that this search was conducted some two hours after Ortega, Orsini and Perez were arrested. There are several answers to this. We prefer to support the final search at the Headquarters of the Narcotics Squad, after the arrests of appellants, by the ruling of the Supreme Court in Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) relative to the search of an automobile that is liable to forfeiture.[4] Here the Jaguar was clearly subject to forfeiture, pursuant to the provisions of 21 U.S.C., Section 881, applicable to the search of vehicles "which are used, or are intended for use, to transport, or in any manner to facilitate the transportation" of a narcotic drug.

It would seem that the search could also be sustained under the principle of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), applicable to automobiles, when there is probable cause to search the car as distinguished from mere probable cause to arrest the defendants. *Chambers* seemingly supports the proposition that where

---

3. See United States v. Canieso, 470 F.2d 1224, 2d Cir., 1972, and cases cited.

4. The continued validity of *Cooper* was reaffirmed by the Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 482, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). See also United States v. Francolino, 367 F.2d 1013 (2d Cir. 1966), cert. denied 386 U.S. 960, 87 S.Ct. 1020, 18 L. Ed.2d 110 (1967).

the police may stop and search an automobile under the doctrine of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), they may also seize it and conduct the search at a later time.[5]

## B

### The Search of Orsini's Room 6J at the Hotel Alrae Pursuant to a Warrant

■ The claim that the affidavit in support of the issuance of the search warrant of Orsini's room was insufficient is frivolous. So is the claim that it was error to refuse to conduct a hearing to ascertain whether the warrant was "tainted" by the alleged unlawful eavesdropping by one of the agents who occupied Room 6I, adjoining Orsini's Room 6J, who might have heard some conversations through the wall with his naked ear, or might have seen something by peeping through the keyhole of the door between the two rooms. It was discovered that an agent had been in this room when the prosecutor handed over to defense counsel the mass of what is called 3500 material.

Of all the speculations of counsel with which the briefs of the appellants are replete this one is the most farfetched and fanciful. How any information obtained in the adjoining room could be "related to the allegations establishing probable cause in the warrant" is far from clear to us. The almost compelling inference is that there was more than enough probable cause to be found: in Gunther's testimony that he gave the parking ticket to Orsini and arranged to receive the money from him at the Sports Bar the following Monday; the sketch of the places where the heroin was concealed in the framework of the car, the directions concerning how to get the heroin out of the car and the method to be followed in identifying and meeting Gunther, all of which documents were found in Orsini's possession at the time of his arrest; his riding around with Ortega and Perez, and the final

joint possession of the Jaguar and its one bag of heroin; all this convinces us that the so-called "taint" hearing was properly denied. It would have been error to rule that any such hearing should be had, under the circumstances of this case.

Besides, there had already been one suppression hearing on the subject of the search of Orsini's room before the trial commenced. The affidavit supporting the warrant, which made no reference to anything observed by the agent in the room next to Orsini's, had been found constitutionally sufficient; and no evidence of anything seen or heard by this agent was offered at the trial.

■ Moreover, what is supposed to be illegal about the conduct of this agent in the next room? It is conceded that no electronic surveillance was in any way involved. What can be heard by the naked ear is not protected by the Fourth Amendment, United States v. Llanes, 398 F.2d 880 (2d Cir. 1968), cert. denied 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969). The Supreme Court had already noted that "The risk of being overheard by an eavesdropper * * * is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." Hoffa v. United States, 385 U.S. 293, 303, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966), quoting with approval from Justice Brennan's dissent in Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). We would suppose that the same rule applied to what can be seen by the naked eye, even through a keyhole.

## C

### The Search at 608-82nd Street, North Bergen, N.J.

We find the affidavit supporting the warrant to search these premises, and the evidence adduced at the trial, made a more than sufficient showing of probable cause. The mere fact that no money

5. See Coolidge v. New Hampshire, 403 U.S. 443, 463, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

or narcotics were found is of no moment. The claim of insufficiency is just as frivolous as the one made in connection with the search of Orsini's Room 6J at the Hotel Alrae.

## IV

*The False Statements by Orsini in his brief Interrogation before His Arraignment Were Properly Received*

The arrests took place at about 2:20 A.M. of Sunday, September 19. There was a brief questioning at Narcotics Headquarters after the *Miranda* warnings had been given. Neither then nor at any time was Orsini subjected to any prolonged interrogation, nor was he asked any other than the most perfunctory questions. But, as these events occurred early in the morning of a Sunday, when no Commissioner was available, and the following Monday was a Jewish Holiday and the office of the United States Attorney was understaffed, Orsini was not brought down to the Courthouse until about 1:30 P.M., although a Commissioner was in attendance from 10:00 A.M. on. There was a brief interrogation by an Assistant United States Attorney prior to arraignment. What this amounted to, with the assistance of a French interpreter, was the submission to Orsini of a series of written questions. He was told to answer the ones he wished to answer and not to answer the others. This was after the *Miranda* warnings had been repeated to him. The answers he gave were false in that he gave a false name, denied he had been in an automobile with other people on the preceding Saturday night, and he denied he had ever been in the Abbey Victoria Hotel. The trial judge overruled the objection to these admissions on the ground that they were clearly voluntary and that the *Miranda* warnings had been properly given.

■ We are now asked to hold that the answers should have been excluded and the judgment of conviction against Orsini reversed, not because the state-

ments were not voluntarily made but solely because the lapse of time between the early morning of Sunday when the arrest was made and the arraignment before the Commissioner in the mid afternoon of Monday was more than 6 hours in excess of the time required for transportation. We agree with the holding of this Court in the similar case of United States v. Marrero, 450 F.2d 373 (2d Cir. 1971) to the effect that no violation of the principles of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) is shown, nor any failure to comply with the requirements of Title II of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C., Section 3501. We also refuse to accept the invitation by Orsini's counsel to reexamine the holding of this Court in *Marrero* or to hold 18 U.S.C., Section 3501 unconstitutional.

The writer of this opinion also wishes to state that he disagrees with the suggestion or intimation or whatever it may be called, in Chief Judge Friendly's concurring opinion in *Marrero* at page 379 of 450 F.2d that there is something improper, after overnight custody, in the traditional custom of a "detour" for brief questioning in the office of the United States Attorney, as a person who has been arrested is being taken before a magistrate for arraignment.

## V

*The Bizarre Motion for a Severance and for a Mistrial on Behalf of Ortega*

■ After both sides had rested and the summations were about to begin, a new lawyer appeared on Ortega's behalf and made a motion "for a mistrial as to Mr. Ortega and for a severance of his case from the trial of Mr. Orsini." This turn of events is supposed to have been caused by a desire on the part of Orsini "to exculpate" Ortega, "but he is not prepared to do it before the jury that will decide the question of his (Orsini's) guilt or innocence." No credible explan-

ation of how Orsini is to do this exculpating is proffered. The trial judge denied the motion, but with leave to renew it on written papers after the jury had rendered its verdict. So, the motion was renewed later on written papers and we are asked to give serious consideration to Orsini's generous proposal that if his case is or had been severed, he would have taken the witness stand and his exoneration of Ortega would be so convincing and persuasive that Ortega would be acquitted. Just what explanations Orsini was prepared to give for all the things he and Ortega had done together in furtherance of the conspiracy is left to conjecture. This is reminiscent of the statement by Orsini's counsel during the trial that if the government informer was produced Orsini might recognize him as the man who solicited him to come from abroad but had concealed from him the fact that heroin was involved, and that Orsini would testify to this as a witness in his own defense. Of course, Orsini did not testify to this or anything else.

We are solemnly told that Ortega was going to call upon Orsini as his witness in defense but failed to do so as he anticipated that Orsini would assert his Fifth Amendment privilege. We are also solemnly told that "Orsini forthrightly stated that Luis Ortega and George Perez had absolutely no knowledge that the Jaguar contained heroin."

We hold that there is no merit in this extraordinary and tardy maneuver. The trial judge properly denied the motion, and this ruling furnishes no basis for a reversal of any of the judgments appealed from.

## VI

*There Was No Impropriety on the Part of the Prosecutor in Making Reference During His Summation to the Dates in the Passport Carried by Orsini*

 There was testimony by Gunther that Orsini had told him he had visited the United States on other occasions on similar illicit business. This is to some extent corroborated by other testimony. The brief and incidental reference in the prosecutor's summation to the dates in the passport was of no consequence. The passport had been received in evidence without objection and without limitation. The jury could if they chose examine any and all of the entries in the passport. However, in the light of the evidence taken as a whole, it is highly improbable that the jury took any interest in the passport or in Orsini's other trips to the United States, except perhaps to take note of the fact that Orsini was using a passport issued to someone else, that he was masquerading under this other person's name, and that he or some other person at his request had done an especially clever piece of forgery by substituting Orsini's photograph for the photograph of the real Jean Pierre Andre Huguen.

The prosecutor denied that he had orally agreed not to make reference in his summation to the entries in the passport. As held by the trial judge, it would have been a simple matter for counsel to insert this limitation in the written stipulation. The passport was received in evidence for all purposes; and the trial judge properly held that it must be presumed "that the stipulation embodies the full and complete agreement of counsel." It would have been error to grant counsel's request to instruct the jury that the passport was no proof of prior trips by Orsini to this country.

We cannot conclude this opinion without a word of comment on the wholly admirable way in which the prosecution of this complicated and difficult case was conducted by Assistant United States Attorney John M. Walker, Jr.

Affirmed.