UNITED STATES of America

v.

Royce N. MOORE, Michael Palmer, and
Sheila Richardson, Defendants.

No. 78 CR. 661 (TPG).

United States District Court,
S. D. New York.

Jan. 26, 1979.

Lawrence K. Feitell, New York City, for defendant Moore.

Robert P. Leighton, New York City, for defendant Palmer.

Alvin Geller, New York City, for defendant Richardson.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York by Henry H. Korn, Asst. U. S. Atty., New York City, for United States.

## OPINION

POLLACK, District Judge.

Indictment 78 Cr. 661 charges Michael Palmer and Sheila Richardson with conspiracy to distribute cocaine and all three defendants with possession of and intent to distribute cocaine. Each defendant moved to suppress the physical evidence seized at the scene of their arrest. The defendant Moore moved also to suppress certain statements that he made to agents of the Drug Enforcement Administration (DEA) shortly after his arrest. The motions were referred to the undersigned for an evidentiary hearing. For the reasons shown hereafter, the motions will be denied in all respects.

On August 9, 1978, DEA Agent Glauner and the defendant Palmer began to negotiate a sale of cocaine. Glauner knew from DEA reports that Palmer had sold cocaine to undercover agents before. The negotiations between Glauner and Palmer took place in numerous telephone calls and two meetings in person. At the first of these meetings, Palmer showed Glauner a white powder that he said was cocaine and offered to sell Glauner up to one-half an ounce. Glauner declined Palmer's offer, saying that he needed at least four to six ounces. On August 22, Palmer agreed to sell Glauner six ounces of cocaine for $10,-000. Palmer told Glauner that he had met with his supplier in a building on 89th Street and York Avenue in Manhattan and instructed Glauner to meet him that afternoon on the corner of 89th and York to close the deal.

At 1:45 in the afternoon of August 22, DEA agents on that corner observed Palmer entering the apartment building at 1725 York Avenue and then leaving the same building 15 minutes later. Glauner arrived in the area by car, Palmer joined him, and they parked on a side street. Glauner allowed Palmer to count the $10,000, but refused to give Palmer the cash until Palmer gave Glauner the cocaine. Palmer then got out of Glauner's car and reentered the building at 1725 York Avenue.

Agent Hall followed Palmer into the vestibule of the building and overheard Palmer telling the doorman that he wanted to go to Apartment 18–E. Hall then identified himself to the doorman as a federal agent investigating Palmer and asked whom Palmer had gone up to see in Apartment 18–E. The doorman told Hall that Palmer had gone up to see a woman named Sheila Richardson. Hall then directed Agent Aponte to stay with the doorman and asked the doorman whether he could go up to the 18th floor. The doorman said he could. As Hall arrived on the 18th floor, Palmer walked out of Apartment 18–E. Hall went down the stairway to the 17th floor, where he took the elevator and found Palmer was also on it, and they descended together to the lobby. From there Hall followed Palmer until he observed him re-joining Glauner in the car.

Palmer told Glauner in the car that he was dealing with a woman who was afraid and would not let the drugs out of the apartment until she had the money. Palmer and Glauner discussed the matter, and Glauner suggested that Palmer bring half of the cocaine, Glauner would give Palmer all of the cash, and Palmer could then bring the rest of the cocaine. Palmer then got out of the car and returned to 1725 York Avenue. Glauner advised Hall by radio that Palmer was dealing with a woman who would not let the drugs out of her apartment.

Agents Hall and Maddox followed Palmer into 1725 York Avenue and up to the 18th floor. From ten feet away from the door to Apartment 18–E, the agents could hear conversation in that apartment but could not make out what was being said. Agent Hall put his ear to the door and heard a conversation between a man and a woman whom he later identified as Palmer and Richardson. Palmer said: "He's got all the money. I counted ten thousand." Richardson replied: "No way I can let it out of this apartment." Palmer then said: "I tried. Well, I tried." Richardson replied: "I tried too, but we will have to pass. Tell him we'll pass."

Moments later Palmer opened the door; Richardson was standing immediately behind him; and Hall and Maddox stepped forward and arrested them both.

Hall then searched Palmer and Richardson in the entryway. Palmer was carrying a camera case which Hall handed to Maddox and Maddox searched for weapons. Inside the camera case was a block of mannitol.

As Maddox guarded Palmer and Richardson, Hall walked into the rest of the apartment to see if anyone else was there. Richardson grabbed Hall and shouted: "Don't go back there, there is nobody back there." Hall shook Richardson off, opened the door to the larger of the two bedrooms, and found Moore lying with his torso across the bed and his legs on the floor. Under Moore's legs were a plastic bag containing white powder and a gym bag. In the side pouch of the gym bag, Hall saw two more bags of white powder. Hall arrested Moore, advised him of his rights, and took him out of the larger bedroom and into the hallway.

Hall then checked the smaller bedroom for other people but found no one. Hall did, however, observe certain items of evidence in plain view on top of the dresser in the smaller bedroom. These included a triple beam scale, a mortar and pestle, and an open pocketbook that contained a plastic bag of black capsules. Hall later directed other agents to seize this evidence, and as they were doing so they discovered other evidence in plain view. This evidence included two bricks of mannitol, 98 rounds of 9mm ammunition, and two boxes of zip-lock

bags, all found on top of the dresser, and two plates of glass and $1,952.55 in cash found on top of the bed.

Just after Hall checked the smaller bedroom, Agent Bell arrived, and Hall directed him to seize the gym bag that had been under Moore's legs in the larger bedroom. As Bell did so, he saw a bag of white power inside the main part of the gym bag.

At about this time, Richardson apparently had an unexpected bowel movement and was brought into the smaller bedroom to change clothes. Hall asked Agent Maddox to guard the door to the bedroom. Richardson then opened a drawer of the dresser, put something in it, and closed it again. Hall returned a few minutes later and asked Maddox where the bag of capsules was that Hall had seen in the bedroom earlier. Maddox replied that Richardson had just opened a drawer and put something in it. He then opened the drawer that Richardson had opened and took out the bag of capsules.

Agents Hall and Tuerack then brought Moore back into the larger bedroom. Hall reminded Moore of his rights and asked whether Moore understood that he had a right to remain silent. Moore said that he did. Hall then said he thought it would be in Moore's best interests to cooperate with the DEA: "[I]n other words, I would like you to help us and we'll help you." Moore said that he would not talk to the agents until he saw the evidence that they had against him. Tuerack brought in the black gym bag and a bag of white powder that had been inside it. Moore said that he didn't know anything about that. Hall told Moore that he had seen Moore carrying the bag into the building. Moore then said: "Well, it might be my bag, but I don't know anything about what's in it." Moore asked Hall what he meant by "cooperation," and Hall explained that he meant cooperation in arresting the supplier of the cocaine in the bag. Moore said, "That can be dangerous." Hall and Tuerack assured Moore that his cooperation would be kept secret, but Moore repeated that it would be too great a risk.

While in the larger bedroom, the agents observed and seized certain additional items of evidence in plain view. On a shelf in an open closet they found a bottle of inositol, a cutting ingredient, measuring spoons, and a strainer. On top of the night table, the agents found a playing card and a business card, both with traces of white powder.

In the living room, the agents found in plain view a clear plastic tray with traces of white powder and a leather portfolio. Agent Vellotta asked Moore if he could look inside the portfolio, and Moore consented. Inside the portfolio were a photograph of Richardson and Moore, Palmer's business card, an address book, and a pocketbook. Some days later Moore's counsel asked the DEA to return Moore's property, and the agents made an inventory of what was seized and what was to be returned. During this inventory, the agents discovered a chunk of cocaine and one-half a tablet of qualude inside the pocketbook that they had found in the leather portfolio.

In order to find a container for the evidence that the agents had accumulated, Bell went into the smaller bedroom and saw a shopping bag on the shelf of an open closet. He took the bag off the shelf and found in it a quantity of mannitol.

Agent Tuerack went into the larger bedroom to seize the clothing that he saw in plain view in the open closet, to be used as evidence of Moore's connection with the bedroom, and to get clothing for Moore to wear to court. After handing Moore the clothing that he had chosen to wear, Tuerack reached back into the closet to seize the remaining clothes in plain view. As he did so, he kicked a hard object on the floor, which he saw was a gun.

The defendants now argue that the presence of the agents in the common areas of 1725 York Avenue violated the Fourth Amendment; that the agents arrested Palmer and Richardson without probable cause; that even if the agents had probable cause, they needed a warrant before arresting anyone in the apartment; that all of the evidence was seized unlawfully; and that Moore's statements were made before

he was advised of his rights and are privileged under Fed.R.Crim.P. 11(e)(6). The Court has concluded that each of these arguments is without merit.

*Presence of the Agents in the Building*

■ The common areas of an apartment building, even if they are normally kept locked, are not places in which tenants of the building have a reasonable expectation of privacy. *United States v. West*, 494 F.2d 1314 (2d Cir.), *cert. denied*, 419 U.S. 899, 95 S.Ct. 180, 42 L.Ed.2d 144 (1973); *United States v. Ortega*, 471 F.2d 1350, 1361 (2d Cir. 1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Wilkes*, 451 F.2d 938, 941 n.6 (2d Cir. 1971); *United States v. Llanes*, 398 F.2d 880, 884 (2d Cir. 1968), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969); *United States v. Boyd*, 407 F.Supp. 693 (S.D.N.Y.1976). The fact that the main entrance to 1725 York Avenue was serviced by a doorman does not make such an expectation of privacy a reasonable one. In either case, the tenant will find other tenants, visitors to other apartments, workmen and others using the common areas. Moreover, the defendants have introduced no evidence that the tenants of 1725 York Avenue actually expected, *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516,-19 L.Ed.2d 576, 588 (1967) (Harlan, J., concurring), that their doorman would bar a federal agent from the building or announce his visit to the apartment in which the object of his investigation was to be found.

■ There is no evidence either for the defendants' argument that Agent Hall intimidated the doorman into admitting him to the building. According to the uncontradicted testimony of Agent Hall, which the Court credits, Hall identified himself to the doorman and asked whom Palmer had gone to see in Apartment 18–E. The doorman replied that Palmer had gone up to see Sheila Richardson, thereby showing some willingness to cooperate with Hall. Agent Aponte then arrived. Hall asked Aponte to stay with the doorman and asked the door-man if he could go to the 18th floor: the doorman said he could. The defendants assert that by asking Aponte to stay with him, Hall must have cowed the doorman. But the doorman was present in Court, and if Hall had cowed him, the defendants could have called him to the stand to say so.

■ The fact that Hall placed his ear to the door of Apartment 18–E to make out conversation that he had heard from ten feet away is of no constitutional significance. In *United States v. Ortega, supra,* an agent occupied a hotel room next to the defendant's. The defendant alleged that the agent "might have heard some conversations through the wall with his naked ear, or might have seen something by peeping through the keyhole of the door between the two rooms." 471 F.2d at 1361. The Court of Appeals wrote:

> [W]hat is supposed to be illegal about the conduct of this agent in the next room? It was conceded that no electronic surveillance was in any way involved. What can be heard by the naked ear is not protected by the Fourth Amendment . . . . We would suppose that the same rule applied to what can be seen by the naked eye, even through a keyhole. (*Id.*)

*See also United States v. Boyd, supra,* 407 F.Supp. at 694 (police may listen "at the door" of apartment with consent of superintendent).

*Probable Cause to Arrest Palmer and Richardson*

■ The information that the agents had when they arrested Palmer and Richardson would have warranted a prudent person in believing that those defendants had committed or were committing a crime. The agents knew that Palmer had sold cocaine before, that he had shown Glauner a white powder that he said was cocaine and had offered to sell it, that he had agreed to sell Glauner six ounces of cocaine for $10,000, and that he had twice left Glauner's car to visit the person whom he said was his supplier of cocaine. These facts amply established probable cause to arrest Palmer.

As for Richardson, Palmer had told Glauner that his supplier was in a building at 89th Street and York Avenue (which was partially corroborated when the agents saw Palmer enter 1725 York Avenue before his rendezvous with Glauner) and that he was dealing with a woman who would not release the cocaine until she was paid (which was partially corroborated by the doorman's statement to Hall that Palmer had gone to Apartment 18–E to see a woman named Sheila Richardson). Hall overheard a conversation in Apartment 18–E in which a woman said: "No way I can let it out of this apartment. . . . Tell him we'll pass." The door then opened, revealing Richardson standing immediately behind Palmer, whom the agents recognized. These facts would have warranted a prudent person in believing that Richardson was Palmer's supplier.

*Warrantless Arrest in a Home*

The defendants argue that there were no exigent circumstances to justify the warrantless arrests in Apartment 18–E. *United States v. Reed*, 572 F.2d 412 (2d Cir. 1978); *United States v. Campbell*, 581 F.2d 22 (2d Cir. 1978). The Court doubts that the rule of *Reed* and *Campbell* applies where a person inside the dwelling opens the front door to go out, rather than in response to a knock or other announcement from outside, and thereby reveals himself or another to the view of someone in a public area outside the door. *Cf. United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (no warrant needed to arrest person "standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence," *id.* at 40 n.1, 96 S.Ct. at 2408, 49 L.Ed.2d at 304). Even if *Reed* and *Campbell* do apply, however, the exigent circumstances here justified the warrantless arrests.

When Agent Hall was listening at the door of Apartment 18–E, his gun was drawn. This was a reasonable precaution in view of the likelihood that Palmer would leave the apartment to return to Glauner and would recognize Hall, with whom he had ridden down in the elevator after his previous visit to Apartment 18–E. Moments after Richardson said "Tell him we'll pass," Palmer opened the door to find Hall, with his gun drawn, and Maddox. In addition, Palmer and Richardson were strongly suspected of serious crimes; it was reasonable to think that they were armed, *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976); the agents had good reason to fear that at least Palmer would escape immediately; and the agents entered the apartment peacefully after Palmer opened the door. Plainly these were exigent circumstances.

The defendants argue, however, that upon hearing Richardson say "Tell him we'll pass," the agents should have deduced that Palmer was about to leave, then retreated from the door in order to let Palmer walk to a place where he could be arrested without alerting the people inside the apartment, and finally gotten a warrant to arrest those remaining in Apartment 18–E. That course would have been foolhardy at best: Palmer might have spotted Hall in the corridor; he might have eluded the agents on the street, who were not in radio contact with Hall or Maddox; or if Palmer were arrested, his prolonged absence might have alerted the occupants of the apartment and prompted them to destroy evidence.

*Lawfulness of the Seizures*

Most of the evidence that the agents seized was in the plain view of Hall as he checked to see if there were other people in the apartment, *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir. 1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973), or of the agents who seized the evidence that Hall had seen, or of the agents who were guarding Palmer and Richardson in the living room. *United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977). Hall was not required to seize the evidence that he saw in one room before continuing his check of the rest of the

**1272**

apartment for other people. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

 The gun came into the plain view of Tuerack as he was seizing clothing in his plain view and getting clothing for Moore, as he was obligated to do, *United States v. Di Stefano,* 555 F.2d 1094, 1101 (2d Cir. 1977). The Court credits the uncontradicted testimony of Agent Bell that the shopping bag in which he found mannitol was in his plain view, that his sole purpose in taking it was to carry items already seized, and that his discovery of the mannitol was inadvertent. *See United States v. Berenguer, supra.* The defendants have not objected to the agents' use of other bags found in the kitchen for the same purpose.

 The search of the camera case that Palmer was carrying was a reasonable search to assure the safety of the agents, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), especially since only Maddox was available to guard Palmer and Richardson when Hall began his check of the rest of the apartment, and neither agent had handcuffs. Finally, Hall testified that Moore consented to the search of his portfolio, and there is no evidence that he did not consent freely.

*Moore's Statements*

Moore has moved to suppress his statements to Agents Hall and Tuerack because he was not advised of his rights and because the statements are privileged under Fed.R.Crim.P. 11(e)(6). The uncontradicted testimony of Agent Hall was that he advised Moore of his rights when he arrested him and reminded Moore of his rights and asked if Moore understood that he had a right to remain silent before Hall and Tuerack sought his cooperation. Rule 11(e)(6) is not applicable, because Moore did not offer to plead guilty or nolo contendere, nor did his conversation with the agents look toward such a plea.

Accordingly, the defendants' motions are, in all respects, denied.

SO ORDERED.