UNITED STATES of America,
Appellant,

v.

David H. MOORE.

No. 78–1594.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1978.

Decided Nov. 21, 1979.

Rehearing Denied Jan. 2, 1980.

Constantine J. Gekas, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry and Theodore A. Shmanda, Asst. U. S. Attys., Washington, D.C., were on brief, for appellant.

Edwin C. Brown, Washington, D.C., for appellee.

Before ROBINSON and WILKEY, Circuit Judges, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge, SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In the case before us, the Government appeals from the District Court's dismissal of a four-count indictment charging David H. Moore with making false declarations before a grand jury.[1] The dismissal followed the Government's refusal to allow Moore to reappear before the grand jury to retract the allegedly fabricated testimony, and thereby to invoke a dispensation from prosecution statutorily accorded recanting perjurers in specified circumstances.[2]

At the outset, we were concerned that jurisdiction to entertain this appeal might

be foreclosed by the Double Jeopardy Clause,[3] and accordingly we requested supplemental briefs addressing the question. With that assistance and our own intensive study of the problem, we now conclude that the Double Jeopardy Clause poses no barrier to resolution of the issues tendered.[4] On the merits, we reverse the District Court's order of dismissal and remand the case for further proceedings.[5]

## I

This case had its genesis in a grand jury probe into possible corruption and bribery within the Metropolitan Police Department of the District of Columbia. In the early spring of 1977, prior to the grand jury proceeding, the Department's Internal Affairs Division placed Bosco's Carryout—an establishment in Northwest Washington—under observation in an effort to ascertain whether criminal activities were being conducted therein, and, if so, whether any police officers were implicated in them.[6] Physical and photographic surveillance of the carryout was conducted until an officer working undercover in connection with the investigation learned that the vigil had been detected by the carryout's proprietor.[7] Reacting to this discovery, the Internal Affairs Division attempted to mask the real purpose of the operation by circulating se-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The indictment was predicated upon the Organized Crime Control Act of 1970, Pub.L. No. 91–452, tit. IV, § 401(a), 84 Stat. 932 (1970), as amended by Pub.L. No. 94–550, § 6, 90 Stat. 2535 (1976), codified at 18 U.S.C. § 1623(a) (1976), in relevant part providing:

    Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.

    The Act is hereinafter cited as codified. Section 1623 supplements 18 U.S.C. § 1621 (1976), the general perjury statute, and differs from it in material respects highlighted in Part III infra.

2. 18 U.S.C. § 1623(d), quoted in text infra note 73.

3. "No person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

4. Discussed in Part II infra.

5. Discussed in Part III infra.

6. The overall investigation

    focused on the possible receipt or purchase of stolen property, . . . the transmission of gambling information by telephone, . . . the conduct of an illegal gambling business, . . . the bribery or attempted bribery of members of the Metropolitan Police, . . . and the acceptance of bribes and illegal gratuities. . . .

    Brief for Appellant at 3; Indictment, First Count, ¶ 2; Trial Transcript (Tr.) 21–22.

7. Tr. 4–5; Indictment, First Count, ¶ 3.

lectively a false cover story concerning its objective.

Moore, a police officer, heard the cover story from Walter Whited, a fellow officer. Moore was told that the investigation was aimed at apprehending a suspected narcotics dealer.[8] Moore came under suspicion as a possible conduit of information when shortly thereafter the undercover officer found out that the owner of the carryout had the story as it had been related to Moore by Whited.[9] A month later, at Moore's request, Whited met him at a service station; there, equipped with a concealed recorder, Whited taped their conversation, including Moore's detailed questions concerning the surveillance, the cover story, and the involvement of another police officer in the investigation.[10]

After passage of another month, the investigation was terminated, and a grand jury was convened.[11] Early in the proceeding, the grand jury inquired whether Moore and other suspected officers had endeavored to secure information on the carryout surveillance from within the Department, and whether any such information had been passed on to the carryout's proprietor 'in exchange for remuneration.[12] Moore went before the grand jury and was quizzed on his two conversations with Whited. Moore denied any recollection at all of the first session or the date of the second, though he admittedly did remember a meeting with Whited at a service station.[13] Moore, however, avowed that the latter colloquy was unrelated to police business; he stated that he had never called anyone, including Whited, to ask about the investigation of the carryout.[14] This testimony formed the basis of the subsequent indictment against Moore for making false statements before the grand jury.[15]

Toward the end of 1977, Moore and his counsel met with representatives of the Internal Affairs Division and an assistant United States attorney in the latter's office. After additional questioning on his rendezvous with Whited at the service station, Moore was informed of the tape recording of their conversation.[16] The tape was played, and counsel informed Moore that by statute he might escape criminal liability for perjurious statements by reappearing before the grand jury and admitting the falsity of his prior testimony.[17] Moore conferred with his attorney and stated that he would do so; he agreed to a tape-recorded rehearsal of the testimony he proposed to give. In that rendition, Moore acknowledged the occurrence of the first conversation with Whited and provided a facially innocent explanation for the second. A few minutes later, however, Government counsel stopped Moore from continuing with his

8. Tr. 5–6.

9. Tr. 5–6.

10. Tr. 7–8.

11. The initial surveillance ceased in early June, 1977. Tr. 5. Whited related the cover story to Moore on June 8, and the proprietor of the carryout knew the cover story by June 15. Tr. 5–6. Whited met Moore for the second time on July 23, and on this occasion the tape recording of their conversation was made. Tr. 9–10. The investigation terminated in late August, and the grand jury began proceedings on September 2. Tr. 21. Moore testified before the grand jury on November 29. Tr. 8. Approximately three weeks later, Moore was summoned to the prosecutor's office, confronted with the tape, and offered the opportunity to recant his prior testimony—an offer that was withdrawn later on the same day when he rehearsed his proposed testimony. Tr. 10–11.

12. Tr. 21–22.

13. Tr. 9.

14. Tr. 7–10; Indictment, First Count, ¶¶ 1, 7, quoting from grand jury testimony of David H. Moore; Second Count, ¶ 2, quoting from grand jury testimony of David H. Moore.

15. The first count of the indictment relates to Moore's testimony before the grand jury concerning his June 8, 1977, conversation with Whited; the three remaining counts deal with the July 23 conversation.

16. Tr. 10; Appendix for Appellant (App.) 11, 18.

17. Tr. 10; App. 11, 18–19. 18 U.S.C. § 2623(d) (1976), to which counsel obviously referred, is quoted in text *infra* at note 73.

new version, stating that he did not deem it credible.[18] In 1978, Moore was indicted.

On the day appointed for Moore's trial, the District Court made known its desire to begin the session with a ruling on the materiality of Moore's statements to the grand jury.[19] There was a delay, however, occasioned by the absence of the Government's primary witness on materiality, and the court stated that during this interval it would commence selection of a jury. At this juncture, Moore's counsel revealed that his client's sole defense would be strictly legal—predicated entirely upon an asserted lack of materiality[20]—thus eliminating any factual dispute for submission to a jury. The court then advised Moore of his constitutional right to a trial by a jury, and informed him that "your waiver of that means that this would be a matter that is submitted to the Court."[21] After consultation with his attorney and an explanation of the consequences by the court, Moore expressly waived his right to a jury trial.[22]

An evidentiary-type proceeding was then conducted. The only witness was the deputy foreman of the grand jury, whose testimony went exclusively to the issue of materiality. This phase completed, Moore's counsel raised an additional defense. Counsel contended that Moore's statements in the prosecutor's office brought the case within the purview of the statutory provision barring prosecution of recanting witnesses.[23] The court heard argument on the point and, after a two-hour recess, ruled that the prosecution was barred.

In response to the Government's petition for reconsideration, the court convened a hearing at which it inquired whether the Government would allow Moore to reappear before the grand jury for the purpose of testifying anew. The Government advised that it was not willing to do so, whereupon the court denied the petition.[24] Subsequently, the court filed an opinion and an order formally dismissing the indictment.[25] This appeal followed.

## II

Our jurisdiction to hear this case depends upon a statute providing that the Government may appeal from the dismissal of indictments in criminal cases, "except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."[26] Before undertaking a decision on the merits, therefore, we must determine whether the Double Jeopardy Clause countenances resumed proceedings on the indictment against Moore, and thus clears the way for present appellate review of the District Court's action.

■ The proscription against double jeopardy occupies a prominent place in Anglo-American jurisprudence.[27] Because the state is capable of drawing on resources far greater than those at the disposal of an individual, the Double Jeopardy Clause of the Fifth Amendment is a necessary bulwark insuring that an accused will not be forced to suffer the undue anxiety and expense occasioned by multiple prosecutions.[28]

18. Tr. 10; App. 11, 18–19.

19. Tr. 3.

20. Tr. 15–16.

21. Tr. 18.

22. Tr. 15–19.

23. Tr. 91, 95. But see *Dunn v. United States,* 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979).

24. *United States v. Moore,* 463 F.Supp. 1266 (D.D.C.1978), App. 24.

25. *Id.*

26. 18 U.S.C. § 3731 (1976).

27. *United States v. Scott,* 437 U.S. 82, 87, 98 S.Ct. 2187, 2192, 57 L.Ed.2d 65, 71–72 (1978); *Serfass v. United States,* 420 U.S. 377, 387–388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265, 273–274 (1975); *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199, 204 (1957).

28. *United States v. Scott, supra* note 27, 437 U.S. at 88, 98 S.Ct. at 2192, 57 L.Ed.2d at 72; *Serfass v. United States, supra* note 27, 420 U.S. at 388, 95 S.Ct. at 1062, 43 L.Ed.2d at 274; *Green v. United States, supra* note 27, 355 U.S. at 187, 78 S.Ct. at 223, 2 L.Ed.2d at 204.

The clause also serves to safeguard society against the enhanced risk of conviction of innocent persons that could result from the repeated marshalling of the state's vast resources to mount successive prosecutions against an individual.[29] As the Supreme Court has stated, however, the "historical purposes [of the Double Jeopardy Clause] are necessarily general in nature, and their application has come to abound in often subtle distinctions."[30] that are not always self-evident.

Many of the difficulties in applying the clause arise out of attempts to define its relationship to other protections that have developed through progressive judicial interpretation of the Bill of Rights.[31] Although the interdiction on double jeopardy was originally intended "to protect the integrity of a final judgment,"[32] in modern cases courts are often called upon to apply the clause in cases terminated prior to the rendering of a verdict of guilt or innocence by the trier of fact. Such a situation arises in the case at hand. In the District Court, the proceeding against Moore was terminated by the judge's favorable ruling in response to a suggestion by defense counsel that the prosecution was barred by the recantation provision of Section 1623(d).[33]

In ruling on the double jeopardy problem, we begin by addressing the question whether jeopardy attached[34] in the course of the District Court proceeding, for the prohibition is by definition inapplicable if Moore has not yet been placed in jeopardy for the first time. It is well settled "that jeopardy does not attach until a defendant is put to trial before the trier of facts;"[35] in a bench trial, that point is reached as soon as the judge begins to hear evidence.[36] A review of the procedural steps in the District Court demonstrates that this test was satisfied.

Moore is charged with knowingly making false declarations before a grand jury in violation of 18 U.S.C. § 1623(a). On several occasions defense counsel clearly indicated that Moore did not intend to dispute the factual elements of the crime—falsity and knowledge.[37] Moore expressly waived his right to trial by jury, and the case was submitted to the court for decision on the sole issue of materiality.[38] The court expressed its understanding that the proceeding would consist of one trial, leading to resolution of the case,[39] and a witness was sworn and presented evidence relevant to

---

**29.** *United States v. Scott, supra* note 27, 437 U.S. at 87, 98 S.Ct. at 2192, 57 L.Ed.2d at 71–72; *Serfass v. United States, supra* note 27, 420 U.S. at 388, 95 S.Ct. at 1062, 43 L.Ed.2d at 274–275; *Green v. United States, supra* note 27, 355 U.S. at 188, 78 S.Ct. at 223, 2 L.Ed.2d at 204.

**30.** *United States v. Scott, supra* note 27, 437 U.S. at 87, 98 S.Ct. at 2192, 57 L.Ed.2d at 72.

**31.** *Id.* at 87–88, 98 S.Ct. at 2192, 57 L.Ed.2d at 72. As the Court explained,

[a]t the time the Fifth Amendment was adopted, its principles were easily applied, since most criminal prosecutions proceeded to final judgment, and neither the United States nor the defendant had any right to appeal an adverse verdict. See Act of Sept. 24, 1789, ch. 20, § 22, 1 Stat. 84. The verdict in such a case was unquestionably final, and could be raised in bar against any further prosecution for the same offense.

*Id.* at 88, 98 S.Ct. at 2192, 57 L.Ed.2d at 72.

**32.** *Id.* at 92, 98 S.Ct. at 2194, 57 L.Ed.2d at 74; *Crist v. Bretz,* 437 U.S. 28, 33, 98 S.Ct. 2156, 2159, 57 L.Ed.2d 24, 30 (1978).

**33.** 18 U.S.C. § 1623(d) (1976), quoted in text *infra* at note 73.

**34.** The concept of attachment of jeopardy is defined as the "point in criminal proceedings at which the constitutional purposes and policies [of the Double Jeopardy Clause] are implicated." *Serfass v. United States, supra* note 27, 420 U.S. at 388, 95 S.Ct. at 1062, 43 L.Ed.2d at 274.

**35.** *Id.; United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543, 553 (1971).

**36.** *Serfass v. United States, supra* note 27, 420 U.S. at 388, 95 S.Ct. at 1062, 43 L.Ed.2d at 274; *McCarthy v. Zerbst,* 85 F.2d 640, 642 (10th Cir.), *cert. denied,* 299 U.S. 610, 57 S.Ct. 313, 81 L.Ed. 450 (1936).

**37.** See text *supra* at note 20; Tr. 48.

**38.** See text *supra* at note 21.

**39.** Tr. 45–46. While the parties apparently were unclear as to the procedural posture of the case, the court indicated on several occa-

the materiality question.[40] In short, the proceeding, if completed, would have determined whether Moore had violated Section 1623(a), and the court thus was empowered to enter a verdict and judgment acquitting or convicting him of the offense charged.

These facts present at least as strong an argument that jeopardy had attached as those of *Finch v. United States.*[41] There, "[t]he case was submitted to the District Court on an agreed statement of facts;"[42] and the Court found that the defendant was in jeopardy even though the record was not entirely clear "that the submission involved a waiver of [his] right to jury trial."[43] In this case Moore had clearly waived that right, and the judge had begun to hear evidence on the only disputed element of his alleged crime; thus, it is even more apparent that jeopardy attached in the situation at bar. Resultantly, we conclude that the validity of any further prosecution of Moore depends upon the operation of the Double Jeopardy Clause.

The District Court's disposition poses the question whether the clause outlaws resumption of the prosecution against an accused who manages to halt his trial short of a determination of his guilt or innocence of the charge. This problem has been a source of considerable controversy and has eluded final resolution for some time. Prior to confronting the issue, the Supreme Court had developed a set of general principles to guide courts in the application of the Double Jeopardy Clause to mistrials,[44] but the realization that there are fundamental differences between different types of aborted trials has hampered simple extension of these rules to cases in which termination of the proceeding results from the defendant's own initiative.

The Supreme Court first ruled on this issue in *United States v. Jenkins,*[45] holding that "regardless of the character of the midtrial termination, appeal was barred if 'further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would have been required upon reversal and remand.'"[46] The authority of *Jenkins* was subsequently undermined, however, by the Court's decisions in *Lee v. United States;*[47]

---

sions that it believed the case to have been submitted to it for a decision on guilt or innocence. Thus, at one point, the following colloquy occurred:

ASSISTANT UNITED STATES ATTORNEY (AUSA): But that would complete the Government's showing at this time on the pure issue of materiality.

THE COURT: I think perhaps you should have the Whited conversation, shouldn't you?

AUSA: You see, that's my difficulty. What we really are going to do is, in effect, I think, have two trials.

THE COURT: We are not, because counsel has waived his right to a jury trial, as the Court understands it.

AUSA: Yes.

THE COURT: And the defendant. So, therefore, we are not going to have two trials, unless we should get it back again and have it another time. But at this time we are simply going to hear your proffer or you are going to make your case on this point as to the materiality.

Isn't that correct?

DEFENSE ATTORNEY: Yes, Your Honor.

THE COURT: And they are submitting on the balance of it.

Tr. 45–46.

**40.** See text *supra* preceding note 23.

**41.** 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977).

**42.** *Id.* at 676, 97 S.Ct. at 2909, 53 L.Ed.2d at 1050.

**43.** *Id.* at 678, 97 S.Ct. at 2910, 53 L.Ed.2d at 1051 (Rehnquist, J., dissenting).

**44.** See *United States v. Scott, supra* note 27, 437 U.S. at 92–94, 98 S.Ct. at 2194–2195, 57 L.Ed.2d at 75–76.

**45.** 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), *overruled, United States v. Scott, supra* note 27.

**46.** *United States v. Scott, supra* note 27, 437 U.S. at 94, 98 S.Ct. at 2195, 57 L.Ed.2d at 76, quoting *United States v. Jenkins, supra* note 45, 420 U.S. at 370, 95 S.Ct. at 1013, 43 L.Ed.2d at 259.

**47.** 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977). In *Lee,* after the prosecutor's opening statement in the petitioner's bench trial, defense counsel moved to dismiss the underlying information on grounds that it did not allege specific intent as required by the statute under which the petitioner was charged. The trial

and ultimately, in *United States v. Scott,*[48] after reconsideration of the theory and application of the *Jenkins* decision, the Court overruled it.[49]

In *Scott,* the Supreme Court addressed the precise issue we face in this case: whether, once jeopardy has attached, the Double Jeopardy Clause bars "reprosecution of a defendant who has successfully obtained . . . a termination of the trial in his favor before any determination of factual guilt or innocence."[50] The *Scott* Court stated that it had reexamined policies underlying the clause in light of "lessons of experience" indicating that it is in the public interest to allow the Government a broader right of appeal in criminal cases than it had under the *Jenkins* test.[51] The Court further concluded that this could be done without violating the constitutional safeguard against double jeopardy.[52] Accordingly, *Scott* holds that in cases in which jeopardy has attached and the defendant has prevailed in his effort to stop the trial before a decision on his guilt or innocence is reached by the trier of fact, an appeal is open to the Government.[53] Only when the defendant has been acquitted in such cases does the Double Jeopardy Clause bar prosecution;[54] a trial court's ruling is an acquittal only when it " 'actually represents a resolution' [in the defendant's favor], 'correct or not, of some or all of the factual elements of the offense charged.' "[55]

Further elucidating its test, the *Scott* Court explained that a determination in the defendant's favor based on an essentially factual affirmative defense, such as insanity or entrapment, would constitute an acquittal and thus foreclose a review and retrial.[56] The Court characterized such defenses as "relat[ing] to 'the ultimate question of guilt or innocence,' "[57] providing justification for otherwise criminal acts,[58] and "necessarily establish[ing] the criminal defendant's lack of criminal culpability."[59] In contrast, the Court referred to decisions that do not bar review as "legal judgment[s] that . . . defendant[s], al-

court postponed decision on the motion pending further study, and the trial continued without objection until, at the close of evidence, the court granted the dismissal. The petitioner was subsequently reindicted for the same crime and convicted. The Supreme Court, affirming a decision of the Seventh Circuit, rejected the petitioner's claim that his retrial after dismissal of the defective information violated the Double Jeopardy Clause.

**48.** *Supra* note 27.

**49.** *United States v. Scott, supra* note 27, 437 U.S. at 87, 98 S.Ct. at 2189, 57 L.Ed.2d at 71.

**50.** *Id.* at 94, 98 S.Ct. at 2195, 57 L.Ed.2d at 76.

**51.** In the Court's view, "Government appeals from midtrial dismissals requested by the defendant would significantly advance the public interest in assuring that each defendant shall be subject to a just judgment on the merits of his case, without 'enhancing the possibility that even though innocent he may be found guilty.' " *Id.* at 101, 98 S.Ct. at 2199, 57 L.Ed.2d at 80–81 (citation omitted).

**52.** In reaching this conclusion, the Court reasoned that this constitutional right is not infringed when
  the defendant, instead of obtaining a reversal of his conviction on appeal, obtains the termination of the proceedings against him in

the trial court without any finding by a court or jury as to his guilt or innocence. He has not been "deprived" of his valued right to go to the first jury; only the public has been deprived of its valued right to "one complete opportunity to convict those who have violated its laws."
*Id.* at 100, 98 S.Ct. at 2198, 57 L.Ed.2d at 80.

**53.** *Id.* at 98–99, 98 S.Ct. at 2197–2198, 57 L.Ed.2d at 79.

**54.** *Id.* at 91, 98 S.Ct. at 2193–2194, 57 L.Ed.2d at 74.

**55.** *Id.* at 97, 98 S.Ct. at 2197, 57 L.Ed.2d at 78, quoting *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642, 651 (1977).

**56.** *Id.* at 97–98, 98 S.Ct. at 2197, 57 L.Ed.2d at 78–79.

**57.** *Id.* at 98 n. 11, 98 S.Ct. at 2197 n. 11, 57 L.Ed.2d at 79 n. 11, quoting *Stone v. Powell,* 428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067, 1085 (1976).

**58.** *Id.* at 97–98, 98 S.Ct. at 2197, 57 L.Ed.2d at 78.

**59.** *Id.* at 98, 98 S.Ct. at 2197, 57 L.Ed.2d at 78–79.

though criminally culpable, may not be punished," [60] and noted that such rulings "serve other purposes" unrelated to guilt or innocence.[61]

■ Applying the *Scott* test in the instant case, it is apparent that our review of the Government's appeal is not inhibited by the Double Jeopardy Clause. A violation of Section 1623(a)—the provision defining the offense with which Moore is charged—is established upon a showing that (a) the alleged offender made a statement in a proceeding before or ancillary to a federal court or grand jury, (b) that the statement was false and material, and (c) that the declarant knew that his statement was false and material.[62] In this case, Moore conceded that he had knowingly made the false statements charged and protested his innocence solely on the element of materiality.[63] Trial had begun on this issue when Moore's counsel invoked the recantation bar,[64] but the District Court's dismissal of the case was based on its conclusion that the grand jury proceeding—which was still in progress when the trial commenced—had not been affected by Moore's false statements.[65] Notwithstanding Moore's evident failure to admit the falsity of his declarations to the grand jury prior to discovery of his misdeed, the court held that in the absence of a substantial effect on the proceeding he must be afforded the opportunity to recant his prior statement.[66] On this ground the court dismissed the prosecution.[67]

Moore thus succeeded in having his trial terminated by invoking the recantation provision of Section 1623(d). Recantation, however, is not a defense bearing on guilt or innocence, nor, by the same token, a defense such that its assertion may not be appealed without implicating the Double Jeopardy Clause. Unlike insanity or entrapment, recantation does not excuse a defendant because it makes him any less guilty, or justifies his otherwise criminal conduct. Rather, statutory recantation erects a barrier that permits escape from prosecution, despite guilt, in the interest of encouraging corrected testimony and thereby improving the functioning of judicial proceedings.[68] Moore's assertion of the recantation barrier therefore does not prevent his reprosecution unless, in ruling on the applicability of the defense, the District Court somehow reached a resolution of one or more of the elements of the offense with which he is charged.

■ Materiality of the false declarations, as we have noted, was the only element of Moore's alleged crime in dispute in the District Court proceeding. It is also the one and only element possibly shared by the crime-defining provision of Section 1623(a) and the recantation bar of Section 1623(d), since materiality and "substantial effect" are arguably related. Although both concepts involve ascertainment of the role played by a false declaration in a court or grand jury proceeding, a finding of no substantial effect is not the equivalent of a ruling for the defendant on the issue of

---

**60.** *Id.* at 98, 98 S.Ct. at 2197, 57 L.Ed.2d at 79.

**61.** *Id.* 98 n. 11, 98 S.Ct. at 2197 n. 11, 57 L.Ed.2d at 79 n. 11.

**62.** 18 U.S.C. § 1623(a) (1976), quoted in text *supra* at note 1. This is so although the recantation bar of § 1623(d), which we discuss in Part III *infra*, may be raised if in the same continuous proceeding in which the false declaration is made the declarant admits its falsity before it becomes manifest that it has been or will be discovered and the false testimony has not substantially affected the proceeding.

**63.** See text *supra* at notes 20–21.

**64.** See text *supra* at note 23.

**65.** See Tr. 114; *United States v. Moore, supra* note 24, at 3, App. 26 (denying Government's petition for reconsideration).

**66.** The trial court in effect held that a declarant may retract false testimony if he does so *either* before the falsity is discovered *or* before the testimony has substantially affected the proceeding in which it transpired. Our view on this score is set forth in Part III *infra*.

**67.** Tr. 114; *United States v. Moore, supra* note 24, at 1268, App. 27.

**68.** See text *infra* at notes 94–95.

materiality. The test of materiality is "whether the false statement has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made." [69] More specifically, in a grand jury setting, the false testimony must have "the natural effect or tendency to impede, influence or dissuade the grand jury from pursuing its investigation." [70] In short, the effect necessary to meet the materiality test is relatively slight, and certainly not substantial; false testimony that has not had a substantial effect for purposes of Section 1623(d) may still be material in the Section 1623(a) sense. [71] Consequently, the District Court's ruling that Moore's false statements did not have a substantial effect on the grand jury proceeding did not resolve in his favor any of the factual elements of the offense of false declarations. We therefore conclude that there is no constitutional impediment to our review and that we have jurisdiction to entertain the Government's appeal pursuant to Section 3731. Accordingly, we turn to the merits.

## III

The statute under which the Government proceeded offers perjurers a qualified opportunity to recant, and thereby to avoid prosecution and punishment. Modifying prior caselaw on the subject, [72] Section 1623(d) provides:

> Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding,

**69.** *Weinstock v. United States*, 97 U.S.App.D.C. 365, 367–368, 231 F.2d 699, 701–702 (1956); see *Fraser v. United States*, 145 F.2d 145, 149 (6th Cir.), *cert. denied*, 324 U.S. 842, 65 S.Ct. 586, 89 L.Ed.2d 1403 (1944); *Brown v. United States*, 245 F.2d 549, 555 (8th Cir. 1957); *United States v. Icardi*, 140 F.Supp. 383, 388 (D.D.C.1956).

**70.** *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970); see *Weinheimer v. United States*, 109 U.S.App.D.C. 24, 26, 283 F.2d 510, 512 (1960), *cert. denied*, 364 U.S. 932, 81 S.Ct. 381, 5 L.Ed.2d 366 (1961).

**71.** "[I]f the false statement potentially interferes with the grand jury's line of inquiry, materiality is thereby established even though the perjured testimony does not actually impede the investigations." *United States v. Devitt*, 499 F.2d 135, 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975). See also, *e. g., United States v. Kelly*, 540 F.2d 990, 993 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); *United States v. Wesson*, 478 F.2d 1180, 1181 (7th Cir. 1973); *United States v. Gremillion*, 464 F.2d 901, 905 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672 (1972).

**72.** In *United States v. Norris*, 300 U.S. 564, 57 S.Ct. 535, 81 L.Ed. 808 (1937), it was held, under the general federal perjury statute, now 18 U.S.C. § 1621 (1976), that a witness who had testified falsely could not purge himself by later recanting. The Court reasoned:

> Perjury is an obstruction of justice; its perpetuation well may affect the dearest con-

cerns of the parties before a tribunal. Deliberate material falsification under oath constitutes the crime of perjury and the crime is complete when a witness's statement has once been made. It is argued that to allow retraction of perjured testimony promotes the discovery of the truth and, if made before the proceeding is concluded, can do no harm to the parties. The argument overlooks the tendency of such a view to encourage false swearing in the belief that if the falsity be not discovered before the end of the hearing it will have its intended effect, but, if discovered, the witness may purge himself of crime by resuming his role as witness and substituting the truth for his previous falsehood. It ignores the fact that the oath administered to the witness calls on him freely to disclose the truth in the first instance and not put the court and the parties to the disadvantage, hindrance and delay of ultimately extracting the truth by cross examination, by extraneous investigation, or other collateral means.

*Id.* at 574, 57 S.Ct. at 539, 81 L.Ed. at 813. In summary, the Court added:

> The plain words of the statute and the public policy which called for its enactment alike demand we should hold that the telling of a deliberate lie by a witness completes the crime defined by the law. This is not to say that the correction of an innocent mistake, or the elaboration of an incomplete answer, may not demonstrate that there was no wilful intent to swear falsely. We have here no such case.

*Id.* at 576, 57 S.Ct. at 540, 81 L.Ed. at 814.

or it has not become manifest that such falsity has been or will be exposed.[73]

In holding that this provision precluded the Government from pressing the charges against Moore, the District Court relied on his representation that he was and had been prepared to reappear before the grand jury and admit the falsity of the statements specified in the indictment.[74] The grand jury was still in session when Moore reached trial,[75] and the court noted that the Government had not undertaken any showing that the impugned statements had affected the proceeding in which Moore had testified.[76] Believing that it was beyond the prosecutor's discretion to deny Moore's request for an opportunity to recant,[77] the court deemed his representation sufficient to bring Section 1623(d) into play.[78] We find it unnecessary to pass on this course of reasoning, for our review of the record before us reveals that in any event there was an insuperable obstacle to Moore's invocation of that section.

By the terms of Section 1623(d), recantation halts a perjury prosecution only "if, at the time the admission [of falsity] is made, the [prior false] declaration has not substantially affected the proceeding, or it has

not become manifest that such falsity has been or will be exposed." [79] Assuming without deciding that Moore's original testimony had not disturbed the grand jury's investigation,[80] the tape recording of the Moore-Whited conversation at the service station [81]—which at no time has been challenged—left undisputed on the record a showing that, before Moore made any effort toward recantation, the Government to Moore's realization knew that he had lied to the grand jury in the several respects charged.[82] We think this circumstance, without more, defeats Moore's claim to the benefit of Section 1623(d).

■ We are advertent to the consideration that the two events which Section 1623(d) interposes as preconditions to the bar of recantation appear grammatically as alternatives. In the statutory language, falsity of the prior testimony must not have substantially affected the proceeding "or" exposure of the falsity must not have become manifest.[83] Moore obviously assumes, as did the District Court, that he needed to meet only one of these demands. Though the question is difficult, and its solution has taxed our resources severely, we are con-

---

73. 18 U.S.C. § 1623(d) (1976).

74. *United States v. Moore, supra* note 24, at 1268, App. 27.

75. *Id.* at 1267–1268, App. 25–26.

76. *Id.* at 1267–1268, App. 26.

77. *Id.* at 1267–1268, App. 25–26.

78. *Id.* at 1268, App. 26–27.

79. See text *supra* at note 73.

80. The Government argues strenuously that Moore's false statements did affect the grand jury proceeding, but the record is barren on this point. The District Court apparently assumed that the burden was on the Government to prove substantial effect on the grand jury investigation due to the false testimony, rather than on Moore to demonstrate the absence thereof. The court also seemingly adopted the view that a proceeding is not substantially affected if the grand jury is still sitting when the perjurer seeks to correct his prior misstatements. Resolution of the controversy surrounding this issue is not essential to our outcome on the case; we intimate no approval of either assumption.

81. See text *supra* at note 10.

82. Compare *United States v. Del Toro*, 513 F.2d 656, 665–666 (2d Cir. 1975); *United States v. Swainson*, 548 F.2d 657, 663 (6th Cir.), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *United States v. Mitchell*, 397 F.Supp. 166, 177 (D.D.C.), *aff'd sub nom. United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Krogh*, 366 F.Supp. 1255, 1256 (D.D. C.1973); *United States v. Mazzei*, 400 F.Supp. 17, 19 (W.D.Pa.1975). We are mindful that while the first count of the instant indictment related to the first Moore-Whited conversation, see note 15 *supra*, only the second was taped. The falsity of Moore's denial of the first meeting was evident to all, however, from Moore's references during the second meeting to the fictitious cover story that Whited had related at the first.

83. See text *supra* at note 73.

strained to hold that satisfaction of both of these requirements was essential.

█ Normally, of course, "or" is to be accepted for its disjunctive connotation, and not as a word interchangeable with "and." [84] But this canon is not inexorable, for sometimes a strict grammatical construction will frustrate legislative intent.[85] That, we are convinced, is precisely what will occur here unless "or" is read as "and." [86]

Section 1623 was enacted as Title IV of the Organized Crime Control Act of 1970.[87] The legislative history highlights the central purpose of Section 1623 to encourage truthful testimony by witnesses appearing before courts and grand juries.[88] Two inducements—facilitation of perjury prosecutions and a limited opportunity for recantation—were utilized toward that end.[89] Congress abrogated peculiar common-law rules of evidence which specially burdened such prosecutions and thereby increased the chance of conviction therefor.[90] As the Senate Committee on the Judiciary declared, "[l]essening of rigid proof requirements in perjury prosecutions would strengthen the deterrent value of perjury laws and present a greater incentive for truthful testimony." [91] Congress also

---

**84.** *In re Rice,* 83 U.S.App.D.C. 26, 28 n.3, 165 F.2d 617, 619 n.3 (1947); *Gay Union Corp. v. Wallace,* 71 App.D.C. 382, 387, 112 F.2d 192, 197, *cert. denied,* 310 U.S. 647, 60 S.Ct. 1098, 84 L.Ed. 1414 (1940); *George Hyman Constr. Co. v. Occupational Health & Safety Review Comm'n,* 582 F.2d 834, 840 n.10 (4th Cir. 1978); *Quindlen v. Prudential Ins. Co.,* 482 F.2d 876, 878 (5th Cir. 1973); *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir. 1975); *Piet v. United States,* 176 F.Supp. 576, 583 (S.D.Cal.), *aff'd,* 283 F.2d 693 (9th Cir. 1960).

**85.** *De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 976, 100 L.Ed. 1415, 1424 (1956) ("the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity"); *Swearingen v. United States,* 161 U.S. 446, 450, 16 S.Ct. 562, 563, 40 L.Ed. 765, 766 (1896); *United States v. Fisk,* 70 U.S. (3 Wall.) 445, 447, 18 L.Ed. 243, 244 (1865); *In re Rice, supra* note 84, 83 U.S. App.D.C. at 28 n.3, 165 F.2d at 619 n.3; *George Hyman Constr. Co. v. Occupational Health & Safety Review Comm'n, supra* note 84, 582 F.2d at 840; *Peacock v. Lubbock Compress Co.,* 252 F.2d 892, 893 (5th Cir.), *cert. denied,* 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147 (1958).

**86.** That reading was ascribed to legislation in *De Sylva v. Ballentine, supra* note 85, 351 U.S. at 580, 76 S.Ct. at 979, 100 L.Ed. at 1427 (construing "or" as "and"); *Union Central Life Ins. Co. v. Skipper,* 115 F. 69, 72 (8th Cir. 1902) (construing "and" as "or"); *United States v. Cumbee,* 84 F.Supp. 390, 391 (D.Minn.1949) (same); *Travelers Ins. Co. v. Norton,* 24 F.Supp. 243, 246 (S.D.N.Y.1938) (construing "or" as "and"); *United States v. Mullendore,* 30 F.Supp. 13, 15 (N.D.Okl.1939), *app. dismissed,* 111 F.2d 898 (10th Cir. 1940) (construing "and" as "or").

**87.** See note 1 *supra.*

**88.** See S.Rep.No.91–617, 91st Cong., 1st Sess. 33, 57–59, 109–111, 149–150 (1969) [hereinafter cited as "Senate Report"]; H.R.Rep.No.91–1549, 91st Cong., 2d Sess. 33, 47–48 (1970) [hereinafter cited as "House Report"], U.S. Code Cong. & Admin.News 1970, p. 4007; and note 94 *infra.*

**89.** See *United States v. Lardieri,* 506 F.2d 319, 324 (3d Cir. 1974).

**90.** Before the enactment of § 1623, federal law imposed upon perjury prosecutions the so-called two-witness rule, by which "the uncorroborated oath of one witness is not enough to establish the falsity of the testimony of the accused," see *Hammer v. United States,* 271 U.S. 620, 626, 46 S.Ct. 603, 604, 70 L.Ed. 1118, 1120 (1926), and the direct-evidence rule, by which a perjury conviction could not be predicated entirely upon circumstantial as opposed to direct evidence, see *Weiler v. United States,* 323 U.S. 606, 608–610, 65 S.Ct. 548, 549–550, 89 L.Ed. 495, 497–498 (1945). Prior federal law also foreclosed the possibility of convicting a witness who had made two or more irreconcilably contradictory statements unless the Government proved extrinsically which of the statements was false. See, *e. g., McWhorter v. United States,* 193 F.2d 982, 983–984 (5th Cir. 1952). Congress enlarged the Government's ability to obtain perjury convictions by abolishing the evidentiary restrictions and permitting contradictory statements without more to form the basis of prosecution. Senate Report, *supra* note 88, at 109–111, 149–150; House Report, *supra* note 88, at 33, 47–48; 116 Cong.Rec. at 589 (1970) (remarks of Senator McClellan); *id.* at 35292 (remarks of Representative Poff); 18 U.S.C. § 1623(c) (1976).

**91.** Senate Report, *supra* note 88, at 58, quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 201–202 (1967).

changed the existing caselaw [92] by conditionally permitting witnesses to retract prior false declarations without inviting a perjury prosecution.[93] As the House Committee on the Judiciary reported, the recantation provision "serves as an inducement to the witness to give truthful testimony by permitting him voluntarily to correct a false statement without incurring the risk [of] prosecution by doing so." [94]

The congressional effort to improve truthtelling in judicial proceedings was thus twofold. Congress magnified the deterrent role of the criminal law by easing the Government's path to perjury convictions; and the emphasis here was plainly on pressure calculated to induce the witness to speak the truth at all times. Congress also extended absolution to perjurers who recant under prescribed conditions, admittedly an endeavor to secure truth through correction of previously false testimony. Each of these techniques has its own virtue, and it was, of course, the prerogative of Congress to put them to use; but it is evident that in some degree they unavoidably must work at cross-purposes. Recantation, for all its value in ultimately unveiling the truth, may well prove to be a disincentive to veracity in the first instance; to the extent that a perjurer can sidestep prosecution simply by recanting, he is hardly the more prompted to tell the truth in the beginning.[95] By the same token, the deterrent effect of any statute punishing perjury is weakened in the same measure that recantation holds out the promise of possible escape. And indisputably, maximum deterrence of perjury is necessarily inconsistent with maximum range for recantation.

Mere inspection of the text of Section 1623(d) fails to illuminate satisfactorily just how Congress expected the courts to maintain the delicate balance envisioned for these mutually detracting approaches. Not even the closest examination of the statutory text enables one confidently to locate the point, in terms of breadth of the recantation provision, at which the balance was legislatively struck. Of particular moment for the instant case is the seeming anomaly, on the one hand, of a Congress bent on more truthtelling throughout judicial proceedings and, on the other, the strong temptation to prevaricate initially that an expansive reading of that provision would furnish would-be perjurers. If the two preconditions which Section 1623(d) specifies are alternative in nature, a perjurer can avoid prosecution by the simple expedient of recanting before his perjury adversely affects the proceeding, even after his misdeed has been laid bare; if, however, both preconditions must exist before recantation aborts the prosecution, there is much less tug-of-war within Congress' dual methodology for veracity-promotion. Did Congress contemplate treatment of these statutory demands conjunctively or disjunctively? Put another way, how far was the congressional bid for truth in the first instance to be jeopardized by a broader invitation to lie in that instance, though accompanied by a fuller opportunity finally to get to the truth through recantation? As we seek to ascertain whether Moore can lay claim to the recantation provision, these questions come immediately to the fore.

With a literal interpretation of Section 1623(d) on this score thus uncomfortably dubious, we turn to the legislative history for assistance. As the committee reports in

92. See note 72 *supra*.

93. Senate Report, *supra* note 88, at 150; House Report, *supra* note 88, at 33, 47–48.

94. House Report, *supra* note 88, at 48, U.S. Code Cong. & Admin.News 1970, p. 4024. See also 116 (Cong.Rec. 589 (1970) (remarks of Senator McClellan) ("title IV encourages truth . . . by encouraging the correction of testimony without fear of prosecution"); *id.* at 35196 (remarks of Representative Celler) ("[i]n

order to encourage truthful testimony, the title, as amended, permits recantation to be a bar to a false declaration prosecution in certain circumstances"); *id.* at 35292 (remarks of Representative Poff) ("[t]his provision encourages the witness to correct a false statement by permitting him to do so without incurring the risk of prosecution based on inconsistent statements").

95. See note 72 *supra*.

both Houses disclose,[96] the section was modeled on a New York statute,[97] which has an instructive history of its own. In *People v. Gillette*,[98] the Appellate Division unqualifiedly accepted recantation as a defense, and accordingly quashed a perjury indictment, where the defendant, who had testified falsely before a grand jury, corrected himself before leaving the grand jury room.[99] Subsequently, in *People v. Ezaugi*,[100] the Court of Appeals limited the *Gillette* holding to situations wherein the retraction is made "before the body conducting the inquiry has been deceived or misled to the harm and prejudice of its investigation, and where no reasonable likelihood exists that the witness has learned that his perjury is known or may become known to the authorities." [101] In this form, recantation was incorporated into New York's statutory law as an affirmative defense to a perjury charge,[102] and it summons satisfaction of both of *Ezaugi's* demands.[103]

Inexplicably, though the New York statute professedly was the paragon of Section 1623(d)'s specification on recantation, the latter as drafted set forth the preconditions in the disjunctive.[104] The fact is, however, that the congressional treatment of the recantation provision never deviated from the understanding that the New York version had been basically incorporated.[105] Indeed, during hearings on the legislation proposed, the Department of Justice included in its comments to the House subcommittee an interpretation expressly and precisely paralleling New York's conjunctive articulation of the preconditions.[106] At no time did anyone dispute an intended identity between the two statutes in this regard, or reflect a conscious comprehension of a significant difference.[107] Instead, the matter received very little attention, and references on the point—invariably passing—were woefully inconclusive.

Had so drastic a departure from the New York statute as a switch from combinational to alternative satisfaction of its carefully developed preconditions been really intended, we believe Congress would have said so. Had Congress actually intended a nearly complete overruling, in the practical sense, of the Supreme Court's longstanding pronouncement on the serious drawbacks of

96. Senate Report, *supra* 88, at 150; House Report, *supra* note 88, at 47–48.

97. N.Y. Penal Law § 210.25 (McKinney 1965).

98. 126 App.Div. 665, 111 N.Y.S. 133 (1908).

99. 126 App.Div. 665, 111 N.Y.S. at 139. But see *People v. Markan*, 123 Misc. 689, 206 N.Y.S. 197, 199–200 (Sup.Ct.1924).

100. 2 N.Y.2d 439, 161 N.Y.S.2d 75, 141 N.E.2d 580, 64 A.L.R.2d 271 (1957).

101. 161 N.Y.S.2d at 141 N.E.2d at 583.

102. See Practice Commentaries to N.Y. Penal Code § 210.25 (McKinney 1965).

103. "In any prosecution for perjury, it is an affirmative defense that the defendant retracted his false statement in the course of the proceeding in which it was made before such false statement substantially affected the proceeding *and* before it became manifest that its falsity was or would be exposed." N.Y. Penal Code § 210.25 (McKinney 1965) (emphasis supplied).

104. See text *supra* at note 73.

105. There were, of course, some differences but they were minor and unimportant to the question at hand. Compare text *supra* at note 73 and note 103 *supra*.

106. The Department's interpretation was:

If a witness recants in the course of the same continuous court or grand jury proceeding, a prosecution for false statements will be barred, provided that the repudiation is made before it has substantially affected the proceeding, and before it is evident that the witness' false testimony will be exposed. This provides an incentive to the witness who testifies falsely upon his first appearance to retract his testimony and avoid prosecution by thereafter testifying truthfully. *Organized Crime Control: Hearings on S. 30 and Related Proposals Before Subcomm. No. 5 of the House Comm. of the Judiciary*, 91st Cong., 2d Sess. 164 (1970).

107. Individual statements tending in both directions are to be found. Compare, *e. g.*, 116 Cong.Rec. 589 (1970) (remarks of Senator McClellan) with *id.* at 35304 (remarks of Representative Railsback).

recantation in the quest for truth,[108] we would expect a much fuller explanation. Had Congress, after making crystal clear its purpose to promote truthtelling to the hilt,[109] intended the almost wide-open door to prevarication that disinjunctive construction of the statutory preconditions would furnish, it hardly would have failed to elucidate its logic.

The overriding congressional goal in enacting Section 1623(d), we reiterate, was truthtelling to the maximum extent possible.[110] The congressional emphasis, we repeat, was on truthtelling at every step of a witness' testimony.[111] There is no indication whatever that Congress was willing to sacrifice a great deal of deterrence for the uncertain prospect of some addition to the truth from recantation. Section 1623(d) thus emerges as but a limited compromise stopping short of protection for unmasked perjurers. As the House Report states, the recantation provision extends its inducement to truthful testimony "by permitting [the witness] *voluntarily* to correct a false statement without incurring the risk [of] prosecution by doing so." [112] That was the objective, and we are not persuaded that Congress conferred a boon on the perjurer who has frustrated a judicial investigation, or who becomes willing to recant only when confronted with certain exposure.[113]

We conclude that Congress did not countenance in Section 1623(d) the flagrant injustice that would result if a witness is permitted to lie to a judicial tribunal and then, upon only learning that he had been discovered, grudgingly to recant in order to bar prosecution. It has been held implicitly that the recantation provision is available to perjurers only if their previous false testimony has not substantially affected the proceeding *and* it has not become manifest that the falsity has been or will be exposed.[114] We share that view unreservedly, and hold that the case at bar does not fall within the intendment of Section 1623(d).

■ There remains one further problem. Section 1623(d) on its face suggests that the two prerequisites it states are to have alternative rather than conjunctive operation, thus posing the question whether it can be applied as we believe Congress really designed it to be. Criminal statutes are to be strictly construed,[115] and for good reason; [116] they are not to be broadened by intendment,[117] and uncertainty respecting their ambit is to be resolved in favor of lenity.[118]

---

108. See note 72 *supra*.

109. See text *supra* at notes 88–95.

110. See text *supra* at notes 88–95.

111. See text *supra* following note 94.

112. House Report, *supra* note 88, at 48, U.S. Code Cong. & Admin.News 1970, p. 4024 (emphasis supplied).

113. Compare note 72 *supra*.

114. *United States v. Mitchell, supra* note 82, 397 F.Supp. at 177; *United States v. Mazzei, supra* note 82, 400 F.Supp. at 19. In *United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.), *cert. denied sub nom. Kramer v. United States,* 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 323 (1977), the court left open the question whether § 1623(d)'s prerequisites were to be given a conjunctive or disjunctive interpretation.

115. *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379, 389 (1973); *United States v. Campos-Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457, 462 (1971); *United States v. Boston & M.R.R.,* 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728, 731 (1965).

116. See *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 375, 93 S.Ct. 1652, 1663–1664, 36 L.Ed.2d 318, 333 (1973); *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488, 496 (1971).

117. *United States v. Braverman,* 373 U.S. 405, 408, 83 S.Ct. 1370, 1372, 10 L.Ed.2d 444, 447 (1963); *United States v. Resnick,* 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127, 129 (1936); *United States v. Weitzel,* 246 U.S. 533, 543, 38 S.Ct. 381, 383, 62 L.Ed. 872, 875 (1918).

118. *Dunn v. United States, supra* note 23, 442 U.S. at 112, 99 S.Ct. at 2197, 60 L.Ed.2d at 754; *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 285, 98 S.Ct. 566, 572–573, 54 L.Ed.2d 538, 548 (1978); *United States v. Enmons, supra* note 115, 410 U.S. at 411, 93 S.Ct. at 1015, 35 L.Ed.2d at 389; *United States v. Bass, supra* note 116, 404 U.S. at 347, 92 S.Ct. at 522, 30 L.Ed.2d at 496; *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493, 497 (1971).

The wisdom of the ages is reflected in the solemn teaching that "[w]e should not derive criminal outlawry from some ambiguous implication." [119]

█ The strict-construction rule governing interpretation of criminal statutes is not, however, to be woodenly applied. It "cannot provide a substitute for common sense, precedent and legislative history;" [120] it "does not require distortion or nullification of the evident meaning and purpose of the legislation." [121] Nor does it "require that the act be given its 'narrowest meaning,'" [122] or "rejection of that sense of the [statutory] words which best harmonizes with the context and the end in view." [123] In a word, the statute is not to be construed so strictly as to defeat the intention of the legislature. [124]

█ The recantation provision of Section 1623(d) obviously carves out a special exception to the remaining subsections of Section 1623, which define the offense, specify the penalty for it, and prescribe certain of its procedural characteristics. [125] To be sure, as a matter of due process, the burden is upon the Government to prove beyond a reasonable doubt every essential element of offenses it charges. [126] But when a statute sets forth a proviso which is not descriptive of the crime, but which operates to exempt conduct otherwise intercepted from the toils of the law, the burden is upon the accused to bring himself within its protection. [127] Even then, the proviso is

**119.** *United States v. Universal C. I. T. Credit Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 229, 97 L.Ed. 260, 264 (1952). See also *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205 (1958).

**120.** *United States v. Standard Oil Co.*, 384 U.S. 224, 225, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492, 494 (1966). Accord, *United States v. Cook*, 384 U.S. 257, 262, 86 S.Ct. 1412, 1415, 16 L.Ed.2d 516, 520 (1966); *Bell v. United States*, 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905, 910 (1955); *Kordel v. United States*, 335 U.S. 345, 349, 69 S.Ct. 106, 109, 93 L.Ed. 52, 56 (1948); *United States v. Brown*, 333 U.S. 18, 25, 68 S.Ct. 376, 380, 92 L.Ed. 442, 448 (1948).

**121.** *United States v. Gaskin*, 320 U.S. 527, 529–530, 64 S.Ct. 318, 319, 88 L.Ed. 287, 290 (1944).

**122.** *United States v. Raynor*, 302 U.S. 540, 552, 58 S.Ct. 353, 359, 82 L.Ed. 413, 420 (1938), quoting *United States v. Giles*, 300 U.S. 41, 48, 57 S.Ct. 340, 344, 81 L.Ed. 493, 497 (1937). Accord, *United States v. Cook, supra* note 120, 384 U.S. at 262, 86 S.Ct. at 1415, 16 L.Ed.2d at 520; *United States v. Turley*, 352 U.S. 407, 413, 77 S.Ct. 397, 400, 1 L.Ed.2d 430, 434 (1957); *United States v. Bramblett*, 348 U.S. 503, 509–510, 75 S.Ct. 504, 508, 99 L.Ed. 594, 600 (1955).

**123.** *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522, 526 (1936). See also *United States v. Alpers*, 338 U.S. 680, 683, 70 S.Ct. 352, 354, 94 L.Ed. 457, 461 (1950).

**124.** *United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 1117, 55 L.Ed.2d 349, 356 (1978); *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450, 455 (1976); *Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782, 794 (1974); *United States v. Bass, supra* note 116, 404 U.S. at 351, 92 S.Ct. at 524, 30 L.Ed.2d at 498.

**125.** See 18 U.S.C. §§ 1623(a)–(c), (e) (1976).

**126.** *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Johnson v. Louisiana*, 406 U.S. 356, 359–363, 92 S.Ct. 1620, 1623–1625, 32 L.Ed.2d 152, 157–160 (1972); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Cf. *Barnes v. United States*, 412 U.S. 837, 841–846, 93 S.Ct. 2357, 2360–2363, 37 L.Ed.2d 380, 384–387 (1973).

**127.** *McKelvey v. United States*, 260 U.S. 353, 365–367, 43 S.Ct. 132, 134, 67 L.Ed. 301, 304 (1922); *United States v. Chodor*, 479 F.2d 661, 663 (1st Cir.), *cert. denied*, 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); *United States v. Krepper*, 159 F.2d 958, 967–968 (3d Cir. 1946), *cert. denied*, 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947); *Green, Moore & Co. v. United States*, 19 F.2d 130, 131 (5th Cir.), *cert. denied*, 275 U.S. 549, 48 S.Ct. 86, 72 L.Ed. 420 (1927); *United States v. Holmes*, 187. F.2d 222, 225 (7th Cir.), *cert. denied*, 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1372 (1951); *Seven Fifths of Old Grand-Dad Whiskey v. United States*, 158 F.2d 34, 36 (10th Cir. 1946), *cert. denied*, 330 U.S. 828, 67 S.Ct. 870, 91 L.Ed. 1277 (1947). Cf. *Edwards v. United States*, 312 U.S. 473, 483, 61 S.Ct. 669, 675, 85 L.Ed. 957, 964 (1941). It is his burden, too, to demonstrate that the case comes within the reason as well as the words of the proviso. *United States v. First City Nat'l Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151, 155–156 (1967); *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45, 68 S.Ct. 822, 827, 92 L.Ed. 1196, 1203 (1948); *Ryan v. Carter*, 93 U.S. (3 Otto) 78, 83, 23 L.Ed. 807, 809 (1876); *Vondermuhl v. Helvering*, 64 App.D.C. 137, 138, 75 F.2d 656, 657 (1935).

to be narrowly construed,[128] though it relates to a statute wholly criminal in character,[129] and a broad interpretation is inadmissable when it would produce repugnancy with the body of the act.[130] In sum, notwithstanding the formulation of Section 1623(d) grammatically, the will of Congress must prevail.

The order of dismissal is reversed, and the case is remanded to the District Court for further proceedings consistent with this opinion.

*Reversed and remanded.*

**128.** *United States v. Scharton,* 285 U.S. 518, 521–522, 52 S.Ct. 416, 417, 76 L.Ed. 917, 919 (1932); *Great Atl. & Pac. Tea Co. v. FTC,* 106 F.2d 667, 674 (3d Cir. 1939), *cert. denied,* 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521 (1940); *Durovic v. Richardson,* 479 F.2d 242, 250 n.6 (7th Cir.), *cert. denied,* 414 U.S. 944, 94 S.Ct. 232, 38 L.Ed.2d 168 (1973); *United States v. Allan Drug Co.,* 357 F.2d 713, 718 (10th Cir.), *cert. denied,* 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966).

**129.** *United States v. Scharton, supra* note 128, 285 U.S. at 521–522, 52 S.Ct. at 417, 76 L.Ed. at

919; *Thompson v. United States,* 258 F. 196, 200–201 (8th Cir.), *cert. denied,* 251 U.S. 553, 40 S.Ct. 57, 64 L.Ed. 411 (1919); *United States v. Bodine Produce Co.,* 206 F.Supp. 201, 211 (D.Ariz.1962); *United States v. Kansas City So. Ry.,* 189 F. 471, 476 (W.D.Ark.1911); *United States v. Union Pac. R. R.,* 20 F.Supp. 665, 667 (D.Idaho 1937).

**130.** *Dollar Sav. Bank v. United States,* 86 U.S. (19 Wall.) 227, 236, 22 L.Ed. 80, 81 (1874); *Harris v. United States,* 215 F.2d 69, 75–76 (4th Cir. 1954).